**NO. 24-4253**

In The

# United States Court Of Appeals

## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

# ALEXUS PAIGE TYSON,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT GREENBELT**

————————————

**JOINT APPENDIX
Volume I of II
(Pages 1 - 147)**

————————————

**Gregory Dolin
UNIVERSITY OF BALTIMORE SCHOOL OF LAW
1420 N. Charles Street
Baltimore, MD  21201
(410) 837-4610
gdolin@ubalt.edu**

**Darren S. Gardner
OFFICE OF THE
  UNITED STATES ATTORNEY
Southern Division
6406 Ivy Lane
Suite 800
Greenbelt, MD  20770
(301) 344-4029
darren.gardner@usdoj.gov**

*Counsel for Appellant*

*Counsel for Appellee*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA  23219
804-249-7770 ♦ www.gibsonmoore.net

## TABLE OF CONTENTS
## Volume I of II

**District Court Docket Sheet [8:22-cr-00023-LKG-2]**.....................................1

**Indictment as to Alexus Page Tyson**
    **filed April 27, 2022 [DE20]** ...............................................................8

**Transcript of Arraignment Rule 11**
**Before the Honorable Lydia Griggsby**
    **on January 4, 2024 [DE100]**............................................................16

**Plea Agreement,**
**With Attachment,**
    **filed January 4, 2024 [DE101]**.........................................................54

    **Attachment:**

      **A.**    **Stipulation of Facts [DE101-1]**....................................64

**Government's Sentencing Memorandum**
    **filed April 14, 2024 [DE113]** ............................................................67

**Defendant's Supplement to**
**Memorandum in Aid of Sentencing,**
**With Exhibit,**
    **filed May 2, 2024 [DE116]**.................................................................74

    **Exhibit:**

      **A.**    **Character Letters [DE116-1]**......................................76

i

**Transcript of Sentencing Hearing**
**Before the Honorable Lydia K. Griggsby**
    **on May 2, 2024 [DE118]**.......................................................80

**Judgment in a Criminal Case**
    **filed May 6, 2024 [DE119]**....................................................141

**Notice of Appeal**
    **filed May 6, 2024 [DE121]**....................................................147

## <u>TABLE OF CONTENTS</u>
### Volume II of II- UNDER SEAL

**Presentence Investigation Report**
    **filed March 7, 2024 [DE112]** ..................................................148

**Defendant's Memorandum in Aid of Sentencing**
    **filed April 18, 2024 [DE115]** ...............................................168

**Query    Reports    Utilities    Help    Log Out**

<span style="color:blue">APPEAL,CLOSED</span>

# U.S. District Court
## District of Maryland (Greenbelt)
## CRIMINAL DOCKET FOR CASE #: 8:22-cr-00023-LKG-2

Case title: USA v. Nnamani et al

Date Filed: 01/27/2022

Date Terminated: 05/06/2024

Assigned to: Judge Lydia Kay Griggsby

Appeals court case number: 24-4253 Fourth
Circuit Court of Appeals

**Defendant (2)**

**Alexus Paige Tyson**
*TERMINATED: 05/06/2024*

represented by **Michael Edward Lawlor**
Brennan, McKenna & Lawlor, Chartered
6305 Ivy Ln Ste 700
Greenbelt, MD 20770
13014740044
Fax: 13014745730
Email: mlawlor@verizon.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: CJA Appointment

**Adam Christopher Demetriou**
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane
Greenbelt, MD 20770
301-474-0044
Email: ademetriou@brennanmckenna.com
*ATTORNEY TO BE NOTICED*
Designation: Pro Bono

**Gregory Dolin**
University of Baltimore
School of Law
1420 N. Charles Street
Baltimore, MD 21201
202-413-4177
Email: gdolin@ubalt.edu
*ATTORNEY TO BE NOTICED*
Designation: CJA Appointment

**Nicholas George Madiou**
Brennan, McKenna & Lawlor, Chartered
6305 Ivy Lane

**JA1**

District of Maryland (CM/ECF Live NextGen 1.7.1.1)

Suite 700
Greenbelt, MD 20770
301-474-0044
Fax: 301-474-5730
Email: nickmadiou@gmail.com
*TERMINATED: 05/06/2024*
*ATTORNEY TO BE NOTICED*
*Designation: Pro Bono*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18:1349 CONSPIRACY TO COMMIT WIRE AND BANK FRAUD (1) | IMPRISONMENT for a total term of 15 months as to Count 1 of the Indictment; SUPERVISED RELEASE for a term of 3 years as to Count 1 of the Indictment; ASSESSMENT $100.00; RESTITUTION $129,967.22 |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

---

**Plaintiff**

**USA**                    represented by  **Jason Xavier Hamilton**
Office of the United States Attorney
36 S. Charles St.
Baltimore, MD 21201
4435093617
Email: jason.hamilton@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Darren S Gardner**
DOJ-USAO
6406 Ivy Lane
Ste 800
Greenbelt, MD 20770
301-344-4029
Email: darren.gardner@usdoj.gov
*ATTORNEY TO BE NOTICED*

**JA2**

7/1/24, 9:59 AM                           District of Maryland (CM/ECF Live NextGen 1.7.1.1)

*Designation: Assistant US Attorney*

**Gary Michael Morgan , Jr.**
US Attorney's Office
6406 Ivy Lane Ste. 800
Greenbelt, MD 20770
3013440106
Fax: 3013444516
Email: Michael.Morgan5@usdoj.gov
*TERMINATED: 11/30/2023*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/27/2022 | 1 | SEALED INDICTMENT as to Travis Osita Nnamani (1) count(s) 1, 2, Alexus Paige Tyson (2) count(s) 1, Breanna Lee Cartledge (3) count(s) 1. (dass, Deputy Clerk) (Entered: 01/28/2022) |
| 01/27/2022 | 3 | Motion and Order to Seal Indictment and Related Documents as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. Signed by Magistrate Judge Charles B. Day on 1/27/2022. (dass, Deputy Clerk) (Entered: 01/28/2022) |
| 01/31/2022 | | Case as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge Reassigned to Judge George Jarrod Hazel. Chief Judge James K. Bredar no longer assigned to the case. (Corrected STF - filed to correct location of offense resulting in change to divisional assignment) (jf3s, Deputy Clerk) (Entered: 02/02/2022) |
| 04/22/2022 | 8 | Arrest Warrant Returned Executed on 4/22/2022 in case as to Alexus Paige Tyson(mg3s, Deputy Clerk) (Entered: 04/22/2022) |
| 04/22/2022 | 9 | Initial Appearance (Defendant informed of Rights) and Arraignment Hearing as to Alexus Paige Tyson (2) held on 4/22/2022; Plea entered of NOT GUILTY as to count 1 of the Indictment before Magistrate Judge Timothy J. Sullivan.(FTR - Diaz 3B) (mtds, Deputy Clerk) (Entered: 04/22/2022) |
| 04/22/2022 | 10 | CJA 23 Financial Affidavit by Alexus Paige Tyson. (jj2s, Deputy Clerk) (Entered: 04/22/2022) |
| 04/22/2022 | 11 | ORDER pursuant to Fed R Crim P 5(f) and the Due Process Protections Act as to Alexus Paige Tyson Signed by Magistrate Judge Timothy J. Sullivan on 4/22/2022. (jj2s, Deputy Clerk) (Entered: 04/22/2022) |
| 04/22/2022 | 12 | ORDER Setting Conditions of Release as to Alexus Paige Tyson Signed by Magistrate Judge Timothy J. Sullivan on 4/22/2022. (jj2s, Deputy Clerk) (Entered: 04/22/2022) |
| 04/25/2022 | 17 | Receipt for Surrender of Passport as to Alexus Paige Tyson (bs4s, Deputy Clerk) (Entered: 04/25/2022) |
| 04/25/2022 | 18 | NOTICE OF ATTORNEY APPEARANCE Gary Michael Morgan, Jr appearing for USA. (heps, Deputy Clerk) (Entered: 04/25/2022) |
| 04/27/2022 | 19 | MOTION and ORDER to Partially Unseal as to Alexus Paige Tyson, Breanna Lee Cartledge.. Signed by Magistrate Judge Timothy J. Sullivan on 4/27/2022. (dg3s, Deputy Clerk) (Entered: 04/27/2022) |
| 04/27/2022 | 20 | INDICTMENT by USA as to Alexus Paige Tyson, Breanna Lee Cartledge (dg3s, Deputy Clerk) (Entered: 04/27/2022) |

JA3

District of Maryland (CM/ECF Live NextGen 1.7.1.1)

| 04/29/2022 | 21 | CJA 20 as to Alexus Paige Tyson: Appointment of Attorney Michael Edward Lawlor for Alexus Paige Tyson. Signed by Judge George Jarrod Hazel on 4/22/2022. (dg3s, Deputy Clerk) (Entered: 04/29/2022) |
|---|---|---|
| 05/04/2022 | 24 | NOTICE OF ATTORNEY APPEARANCE: Michael Edward Lawlor as CJA Appointment appearing for Alexus Paige Tyson(Lawlor, Michael) (Entered: 05/04/2022) |
| 05/04/2022 | 25 | NOTICE OF ATTORNEY APPEARANCE: Nicholas G Madiou as Pro bono Appointment appearing for Alexus Paige Tyson(Madiou, Nicholas) (Entered: 05/04/2022) |
| 07/27/2022 | 42 | NOTICE OF ATTORNEY APPEARANCE Darren S Gardner appearing for USA. (Gardner, Darren) (Entered: 07/27/2022) |
| 08/15/2022 | 44 | Telephone Conference as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge held on 8/15/2022 before Judge George Jarrod Hazel. (jw2s, Chambers) (Entered: 08/15/2022) |
| 09/16/2022 | 45 | Consent MOTION for Speedy Trial *Tolling and Extension of Time for Filing Pretrial Motions through September 29, 2022, nunc pro tunc* by USA as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. (Attachments: # 1 Text of Proposed Order) (Morgan, Gary) (Entered: 09/16/2022) |
| 10/19/2022 | 46 | Consent MOTION for Speedy Trial *Tolling and Extension of Time to File Pretrial Motions Through November 28, 2022* by USA as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. (Attachments: # 1 Text of Proposed Order)(Morgan, Gary) (Entered: 10/19/2022) |
| 11/06/2022 | 47 | Consent MOTION for Speedy Trial *Tolling and Postponement of Pretrial Motions Through December 19, 2022* by USA as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. (Attachments: # 1 Text of Proposed Order)(Morgan, Gary) (Entered: 11/06/2022) |
| 12/19/2022 | 48 | Consent MOTION for Speedy Trial *Tolling and Postponement of Pretrial Motions to January 20, 2023* by USA as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. (Attachments: # 1 Text of Proposed Order)(Morgan, Gary) (Entered: 12/19/2022) |
| 01/20/2023 | 49 | ORDER granting 48 the Government's Consent Motion for Speedy Trial Tolling and Postponement of Pretrial Motions to January 20, 2023 as to Travis Osita Nnamani (1), Alexus Paige Tyson (2), Breanna Lee Cartledge (3). Signed by Judge George Jarrod Hazel on 1/20/2023. (ols, Deputy Clerk) (Entered: 01/20/2023) |
| 02/14/2023 | | Case as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge Reassigned to Judge Lydia Kay Griggsby. Judge George Jarrod Hazel no longer assigned to the case. (kns, Deputy Clerk) (Entered: 02/14/2023) |
| 03/03/2023 | 50 | MOTION for Extension of Time to File *Pretrial Motions* by Travis Osita Nnamani as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. (Attachments: # 1 Text of Proposed Order)(Marranzini, Ellie) (Entered: 03/03/2023) |
| 03/06/2023 | 52 | Consent MOTION for Speedy Trial *Speedy Trial Tolling and Postponement of Pretrial Motions to March 17, 2023* by USA as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. (Attachments: # 1 Text of Proposed Order)(Gardner, Darren) (Entered: 03/06/2023) |
| 03/06/2023 | 53 | ORDER Granting 50 Consent Motion to Extend Pre-Trial Motions Deadline Nunc Pro Tunc as to Travis Osita Nnamani. Signed by Judge Lydia Kay Griggsby on 3/6/2023. (mg4s, Chambers) (Entered: 03/06/2023) |

JA4

| 03/06/2023 | 54 | ORDER Granting 52 Consent Motion to Exclude Time and Postponement of Pretrial Motions to March 17, 2023 as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. Signed by Judge Lydia Kay Griggsby on 3/6/2023. (mg4s, Chambers) (Entered: 03/06/2023) |
| --- | --- | --- |
| 03/24/2023 | 59 | Consent MOTION for Speedy Trial *Tolling and Postponement of Pretrial Motions to May 17, 2023* by USA as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. (Attachments: # 1 Text of Proposed Order)(Morgan, Gary) (Entered: 03/24/2023) |
| 03/24/2023 | 60 | ORDER Granting 59 Consent Motion to Exclude Time as to Defendants. Signed by Judge Lydia Kay Griggsby on 3/24/2023. (mg4s, Chambers) (Entered: 03/24/2023) |
| 03/27/2023 | 61 | SCHEDULING ORDER as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. Signed by Judge Lydia Kay Griggsby on 3/27/2023. (ols, Deputy Clerk) (Entered: 03/27/2023) |
| 05/08/2023 | 74 | ORDER granting 73 Motion for Protective Order as to Travis Osita Nnamani (1). Signed by Judge Lydia Kay Griggsby on 5/8/2023. (scs, Chambers) (Entered: 05/08/2023) |
| 05/09/2023 | 75 | ORDER Scheduling Evidentiary Hearing re 55 MOTION to Suppress filed by Travis Osita Nnamani. Signed by Judge Lydia Kay Griggsby on 5/9/2023. (mg4s, Chambers) (Entered: 05/09/2023) |
| 09/19/2023 | 91 | NOTICE OF ATTORNEY APPEARANCE: Adam Christopher Demetriou as Pro bono Appointment appearing for Alexus Paige Tyson(Demetriou, Adam) (Entered: 09/19/2023) |
| 11/09/2023 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Alexus Paige Tyson. PLEASE NOTE: Defendant is not in custody. A writ has not been requested. A come up has not been requested. An interpreter will not be needed. Rearraignment set for 1/4/2024 02:30 PM in Courtroom 4B, 6500 Cherrywood Lane, Greenbelt, Maryland 20770, before Judge Lydia Kay Griggsby.(Gardner, Darren) (Entered: 11/09/2023) |
| 11/30/2023 | | PAPERLESS Notice Striking Appearance of Gary Michael Morgan Jr. as counsel. Refer to Miscellaneous case 1:22-mc-0045 for Motion and Order. (jks, Deputy Clerk) (Entered: 11/30/2023) |
| 11/30/2023 | | Attorney update in case as to Travis Osita Nnamani, Alexus Paige Tyson, Breanna Lee Cartledge. Attorney Gary Michael Morgan, Jr terminated. (jks, Deputy Clerk) (Entered: 11/30/2023) |
| 01/04/2024 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Alexus Paige Tyson. PLEASE NOTE: Defendant is not in custody. A writ has not been requested. A come up has not been requested. An interpreter will not be needed. Sentencing set for 4/4/2024 02:30 PM in Greenbelt (for specific location, refer to court website:www.mdd.uscourts.gov/calendar/calendar.asp) before Judge Lydia Kay Griggsby. (Gardner, Darren) (Entered: 01/04/2024) |
| 01/04/2024 | 100 | Rearraignment as to Alexus Paige Tyson (2) held on 1/4/2024, Plea entered Guilty as to Count 1 of the Indictment before Judge Lydia Kay Griggsby. (Court Reporter: Paula Leeper - 4B) (dg3s, Deputy Clerk) (Entered: 01/04/2024) |
| 01/04/2024 | 101 | PLEA AGREEMENT as to Alexus Paige Tyson (Attachment A: # 1 Stipulation of Facts) (dg3s, Deputy Clerk) (Entered: 01/04/2024) |
| 01/04/2024 | 102 | -SEALED- PLEA SUPPLEMENT as to Alexus Paige Tyson (dg3s, Deputy Clerk) (Entered: 01/04/2024) |

JA5

| 01/04/2024 | 103 | Regular Sentencing Order as to Alexus Paige Tyson. Signed by Judge Lydia Kay Griggsby on 1/4/2024. (dg3s, Deputy Clerk) (Entered: 01/04/2024) |
| 03/27/2024 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Alexus Paige Tyson. PLEASE NOTE: THE FOLLOWING HEARING HAS BEEN CANCELLED: Sentencing scheduled for 4/4/2024 at 02:30 located at Greenbelt (for specific location, refer to court website - www.mdd.uscourts.gov/calendar/calendar). An interpreter was not previously requested for this hearing. (Gardner, Darren) (Entered: 03/27/2024) |
| 03/27/2024 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Alexus Paige Tyson. PLEASE NOTE: Defendant is not in custody. A writ has not been requested. A come up has not been requested. An interpreter will not be needed. Sentencing set for 5/2/2024 03:30 PM in Greenbelt (for specific location, refer to court website:www.mdd.uscourts.gov/calendar/calendar.asp) before Judge Lydia Kay Griggsby. (Gardner, Darren) (Entered: 03/27/2024) |
| 04/14/2024 | 113 | SENTENCING MEMORANDUM by USA as to Alexus Paige Tyson (Gardner, Darren) (Entered: 04/14/2024) |
| 04/18/2024 | 114 | -SEALED- MOTION to Seal by Alexus Paige Tyson. (Attachments: # 1 Text of Proposed Order)(Lawlor, Michael) (Entered: 04/18/2024) |
| 04/18/2024 | 115 | **SEALED DOCUMENT** (Lawlor, Michael) Modified on 5/2/2024 (ols, Deputy Clerk). (Entered: 04/18/2024) |
| 05/02/2024 | 116 | Supplement to *Defendant's Memorandum in Aid of Sentencing* (Attachments: # 1 Exhibit A)(Lawlor, Michael) (Entered: 05/02/2024) |
| 05/02/2024 | 117 | ORDER granting 114 Defendant Tyson's Motion to Seal as to 115 Sealed Document as to Alexus Paige Tyson (2). Signed by Judge Lydia Kay Griggsby on 5/2/2024. (ols, Deputy Clerk) (Entered: 05/02/2024) |
| 05/02/2024 | 118 | Sentencing as to Alexus Paige Tyson held on 5/2/2024 before Judge Lydia Kay Griggsby. (Court Reporter: Renee Ewing - 4B) (bus, Deputy Clerk) (Entered: 05/02/2024) |
| 05/06/2024 | 119 | JUDGMENT as to Alexus Paige Tyson (2), Count(s) 1, IMPRISONMENT for a total term of 15 months as to Count 1 of the Indictment; SUPERVISED RELEASE for a term of 3 years as to Count 1 of the Indictment; ASSESSMENT $100.00; RESTITUTION $129,967.22. Signed by Judge Lydia Kay Griggsby on 5/3/2024. (ols, Deputy Clerk) (Entered: 05/06/2024) |
| 05/06/2024 | 121 | NOTICE OF APPEAL by Alexus Paige Tyson Fee Status: CJA. (Lawlor, Michael) (Entered: 05/06/2024) |
| 05/08/2024 | 122 | Transmission of Notice of Appeal and Docket Sheet as to Alexus Paige Tyson to US Court of Appeals re 121 Notice of Appeal - Final Judgment. (slss, Deputy Clerk) (Entered: 05/08/2024) |
| 05/10/2024 | 123 | USCA Case Number 24-4253 as to Alexus Paige Tyson for 121 Notice of Appeal - Final Judgment filed by Alexus Paige Tyson. Case Manager - Rachel Phillips. (slss, Deputy Clerk) (Entered: 05/10/2024) |
| 05/14/2024 | 124 | ORDER of USCA (certified copy) Appointing Gregory Dolin as counsel as to Alexus Paige Tyson re 121 Notice of Appeal - Final Judgment. (Attachments: # 1 New Counsel Notice)(slss, Deputy Clerk) (Entered: 05/14/2024) |
| 05/29/2024 | 125 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Alexus Paige Tyson for proceedings held on Rearraignment on 01/04/2024 before Judge Lydia Kay Griggsby, re 121 Notice of |

JA6

| | | |
|---|---|---|
| | | Appeal - Final Judgment - Transcript due by 7/5/2024. (Court Reporter: Paula J. Leeper) (Attachments: # 1 Transcript Order)(slss, Deputy Clerk) (Entered: 05/29/2024) |
| 05/29/2024 | 126 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Alexus Paige Tyson for proceedings held on Sentencing Hearing on 05/02/2024 before Judge Lydia Kay Griggsby, re 121 Notice of Appeal - Final Judgment - Transcript due by 7/5/2024. (Court Reporter: Renee Ann Ewing) (Attachments: # 1 Transcript Order)(slss, Deputy Clerk) (Entered: 05/29/2024) |
| 06/06/2024 | 128 | Sealed Document (re, Court Reporter) (Entered: 06/06/2024) |
| 06/06/2024 | 129 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Alexus Paige Tyson for dates of 05/02/2024 before Judge Griggsby, re 121 Notice of Appeal - Final Judgment Court Reporter/Transcriber Renee Ewing, Telephone number 3013443227. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 6/27/2024. Redacted Transcript Deadline set for 7/8/2024. Release of Transcript Restriction set for 9/4/2024. (re, Court Reporter) (Entered: 06/06/2024) |
| 06/06/2024 | 130 | Sealed Document (pl, Court Reporter) (Entered: 06/06/2024) |
| 06/06/2024 | 131 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT - Arraignment/Rule 11 Hearing - as to Alexus Paige Tyson for dates of 01/04/2024 before Judge Lydia K. Griggsby, re 121 Notice of Appeal - Final Judgment Court Reporter Paula Leeper, Telephone number (301)344-3229. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 6/27/2024. Redacted Transcript Deadline set for 7/8/2024. Release of Transcript Restriction set for 9/4/2024. (pl, Court Reporter) (Entered: 06/06/2024) |
| 06/18/2024 | 132 | NOTICE OF ATTORNEY APPEARANCE: Gregory Dolin as CJA Appointment appearing for Alexus Paige Tyson(Dolin, Gregory) (Entered: 06/18/2024) |
| 06/18/2024 | 133 | MOTION to Seal by Alexus Paige Tyson. (Dolin, Gregory) (Entered: 06/18/2024) |
| 06/18/2024 | 134 | **PROPOSED SEALED DOCUMENT** (Dolin, Gregory) (Entered: 06/18/2024) |
| 06/20/2024 | 135 | QC NOTICE: 133 Motion to Seal filed by Alexus Paige Tyson was filed incorrectly. **_The following attachments or exhibits are missing - Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 133_** . (ols, Deputy Clerk) (Entered: 06/20/2024) |
| 06/20/2024 | 136 | NOTICE re 133 MOTION to Seal _Motion to Amend Judgment and Postpone Surrender Date, ECF 134_ (Dolin, Gregory) (Entered: 06/20/2024) |
| 06/21/2024 | 137 | SURRENDER ORDER as to Alexus Paige Tyson. Signed by Judge Lydia Kay Griggsby on 6/21/2024. (ols, Deputy Clerk) (c/em USMS 6/24/2024 Modified on 6/24/2024 (dg3s, Deputy Clerk). (Entered: 06/21/2024) |

| PACER Service Center |
|---|
| Transaction Receipt |
| 07/01/2024 09:58:13 |

JA7



Case 8:22-cr-00023-LKG Document 20 Filed 04/27/22 Page 1 of 3

FILED _____ ENTERED

3:23 pm, Apr 27 2022

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

JXH/MM: USAO 2020R00922

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**



| UNITED STATES OF AMERICA | * | GJH-22-023 |
| | * | |
| v. | * | |
| | * | **CRIMINAL NO.** ████████ |
| | * | |
| ████████ | * | **(Conspiracy to Commit Wire and** |
| **ALEXUS PAIGE TYSON, and** | * | **Bank Fraud, 18 U.S.C. § 1349;** |
| **BREANNA LEE CARTLEDGE,** | * | ████████ |
| | * | ████████ **Forfeiture, 18 U.S.C.** |
| **Defendants.** | * | **§ 982(a)(2)(A) and (b)(1), 21 U.S.C.** |
| | * | **§ 853(p), 28 U.S.C. § 2461(c))** |
| | * | |

*******

**INDICTMENT**

**COUNT ONE**
**(Conspiracy to Commit Bank Fraud and Wire Fraud)**

The Grand Jury for the District of Maryland charges that:

**Introduction**

At all times relevant to this Indictment:

████████████████████████████████████████

2.      Defendant **ALEXUS PAIGE TYSON** ("**TYSON**") was a resident of the state of

Maryland and an employee of the United States Postal Service ("USPS").

3.      Defendant **BREANNA LEE CARTLEDGE** ("**CARTLEDGE**") was a resident

of the state of Maryland and an employee of USPS.

4.      Bank of America, Woodforest Bank, PNC Bank, Capital One, and other consumer

banks (collectively, the "victim financial institutions"), were financial institutions within the

USDC– GREENBELT
'22 JAN 27 PM 3:35

meaning of 18 U.S.C. § 20 in that their deposits were insured by the Federal Deposit Insurance Corporation.

### The Conspiracy and Scheme to Defraud

5.    From a time unknown to the Grand Jury, but beginning at least in or about January 2018, and continuing through at least in or about January 2021, in the District of Maryland and elsewhere, the defendants,

**ALEXUS PAIGE TYSON, and
BRIANNA LEE CARTLEDGE,**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury:

a.    to commit bank fraud, that is, to execute and attempt to execute a scheme and artifice to defraud the victim financial institutions, and to obtain and attempt to obtain monies, funds, credits, assets, and securities owned by, and under the custody and control of, the victim financial institutions by means of materially false and fraudulent pretenses, representations, and promises ("the scheme to defraud"), in violation of 18 U.S.C. § 1344; and

b.    to commit wire fraud, that is, to knowingly devise and intend to devise a scheme and artifice to defraud the victim financial institutions, and to obtain money and property from the victim financial institutions by means of false and fraudulent pretenses, representations, promises, and material omissions ("the scheme to defraud"), and for the purpose of executing and attempting to execute the scheme to defraud, to cause to be transmitted by means of wire communication, in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, affecting a financial institution, in violation of 18 U.S.C. § 1343.

2

**JA9**

**Manner and Means of the Conspiracy and Scheme to Defraud**

It was part of the conspiracy and the scheme to defraud that:

6.      **TYSON**, **CARTLEDGE**, and other co-conspirators utilized their positions as USPS employees to wrongfully access USPS money orders and individual mail in the possession of USPS in order to obtain unlawfully and without authorization personal information of victim individuals, including Victim A, and victim businesses.

7.      **TYSON**, **CARTLEDGE**, and other co-conspirators provided to ▓▓▓▓▓▓ personal information of victim individuals, including photographs of checks containing names and bank account numbers, from the wrongfully accessed USPS money orders and individual mail.

8.      ▓▓▓▓▓▓▓▓ and with the assistance of other co-conspirators, created false and fraudulent checks drawn on the bank accounts of the victim individuals whose information ▓▓▓▓ received from **TYSON**, **CARTLEDGE**, and other co-conspirators.

9.      ▓▓▓▓ **TYSON**, **CARTLEDGE**, and their co-conspirators fraudulently negotiated the false checks at the victim financial institutions.

**Overt Acts**

10.     In furtherance of the conspiracy and to effect its objects, the defendants and their co-conspirators committed and caused to be committed the following acts, among others, in the District of Maryland and elsewhere:

a.      On or about August 19, 2019, ▓▓▓▓ sent a text message to **TYSON** requesting that she "please take pics of checks for me today," and instructing **TYSON** to open a letter containing a check, photograph the check, send the photograph to ▓▓▓▓ and reseal and deliver the mail containing the check.

3

**JA10**

    b.    On or about August 19, 2019, ███████ sent a text message to **TYSON** stating, in part, "I deposit this into a bank account," ███████ was "about to cook this one up," and ███████ "just made  drop for 2468 on this capitol one".

    c.    On or about August 19, 2019, in response to a request from ███████ for check information and an explanation of what ███████ does with this information, **TYSON** sent a text message to ███████ asking "how you splitting the money" and "So how much I'm getting".

    d.    On or about August 29, 2019, ███████ sent **CARTLEDGE** a text stating "I be needing checks like this," accompanied by a photography of a personal check. **CARTLEDGE** responded "I got you."

    e.    On or about October 3, 2019, **CARTLEDGE** sent ███████ a photograph of a personal check via text message, to which ███████ responded "[t]ake a pic of the front."

    f.    On or about October 7, 2019, ███████ sent **CARTLEDGE** a text message stating "[c]an you get picks of checks in there". **CARTLEDGE** asked "what kind", and ███████ responded "[b]usiness or any".

    g.    On or about October 17, 2019, **TYSON** negotiated into PNC Bank Account ending in 1295, one counterfeit check (number 1005) fraudulently drawn for $9,500 from the personal checking account of Victim A.

    h.    On or about October 17, 2019, **TYSON** negotiated into PNC Bank account ending in 1287, one counterfeit check (number 1006) fraudulently drawn for $8,000 from the personal checking account of Victim A.

4

**JA11**

j.      On or about May 28, 2020, **CARTLEDGE** negotiated into Capital One account ending in 6201, one counterfeit check (number 1075) fraudulently drawn for $4,900 from the account of Victim A.

18 U.S.C. § 1349

**JA12**



6

**JA13**

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.    Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendants that the

United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C.

§ 982(a)(2) and (b)(1), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the

defendants' conviction of the offense alleged in Count One of this Indictment.

### Bank Fraud and Wire Fraud Conspiracy Forfeiture

2.    Upon conviction of the offense set forth in Count One, the defendants,

**ALEXUS PAIGE TYSON, and
BREANNA LEE CARTLEDGE**,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property which

constitutes, or is derived from, proceeds obtained directly or indirectly, as a result of such

offense.

### Substitute Assets

3.    If any of the property described above as being subject to forfeiture, as a result of

any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided
without difficulty;

7

**JA14**

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), as incorporated

by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of

said defendants up to the value of the forfeitable property.

18 U.S.C. § 982(a)(2)(A) and (b)(1)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

Erek L. Barron
United States Attorney

**SIGNATURE REDACTED**

Foreperson

Date:   January 27, 2022

8

**JA15**

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     GREENBELT DIVISION

 3   _____
                                           )
 4   UNITED STATES OF AMERICA,             )
                                           )
 5        Plaintiff,                       )
                                           )Docket Number
 6             vs.                         )8:22-cr-00023-LKG-2
                                           )
 7   ALEXUS PAIGE TYSON,                   )
                                           )
 8        Defendant.                       )
     _____)
 9

10              TRANSCRIPT OF ARRAIGNMENT/RULE 11
               BEFORE THE HONORABLE LYDIA GRIGGSBY
11              UNITED STATES DISTRICT COURT JUDGE
               Thursday, January 4, 2024, AT 2:30 P.M.
12

13   APPEARANCES:

14   On Behalf of the Plaintiff:

15        DARREN GARDNER, ESQUIRE
          DOJ-USAO
16        6406 Ivy Lane, Suite 800
          Greenbelt, MD  20770
17        (301)344-4029

18   On Behalf of the Defendant:

19        ADAM DEMETRIOU, ESQUIRE
          MICHAEL LAWLOR, ESQUIRE
20        Brennan, McKenna & Lawlor, Chtd.
          6305 Ivy Lane
21        Greenbelt, MD  20770
          (301)474-0044

22

23        ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***

24                     PAULA J. LEEPER
                 Federal Official Court Reporter
25        United States District Court, Greenbelt, Maryland
```

JA16

2

```
 1                    P R O C E E D I N G S

 2        (Court called to order.)

 3        DEPUTY CLERK:  Please rise.  The United States

 4   District Court for the District of Maryland is now in session.

 5   The Honorable Lydia K. Griggsby presiding.

 6        THE COURT:  Good afternoon.  If everyone can be

 7   seated for just a moment, I want to go over the masking policy

 8   for those of you who may not be familiar with it.

 9        In my courtroom, given our current status with a little

10   uptick in COVID-19, I'm asking everyone in my courtrooms to be

11   masked during the proceedings.  The exception to that are for

12   counsel and the defendant.  If you are fully vaccinated and

13   wish to do so, you may remove your mask during the course of

14   the proceedings.

15        The Court is fully vaccinated, boosted many times, so I'm

16   going to remove my mask so you can hear me more clearly.

17   Again, proceed as you feel comfortable, providing that you meet

18   that criteria.

19        I will ask the others in the courtroom please to keep your

20   mask on or to get a mask from the deputy if you need one during

21   the course of today's hearing.

22        With that, I'll invite the United States to please call

23   the case, and we will proceed.

24        MR. GARDNER:  Good afternoon, Your Honor.  The

25   government calls United States v. Alexus Paige Tyson, Criminal
```

3

1  Number LKG22-23.

2      I'm AUSA Darren Gardner on behalf of the United States.

3  We're here for a rearraignment in this case.

4          **THE COURT:**  Good afternoon.  And nice to see you

5  again, AUSA Mr. Gardner.

6      Counsel for the defendant and the defendant?

7          **MR. DEMETRIOU:**  Good afternoon, Judge Griggsby.  My

8  name is Adam Demetriou.  I'm here with co-counsel Michael

9  Lawlor, and we're here on behalf of Ms. Alexus Tyson, who is

10 present to my right.

11         **THE COURT:**  Good afternoon to you, Ms. Tyson.  Thank

12 you for being here.

13     You may be seated for just a moment.

14     Again, I understand we're here for a plea hearing today.

15 The Court does have a copy of the proposed plea agreement.  I

16 will be referring to that throughout, so I want you to go ahead

17 and have that handy at the table.

18     I'm going to invite the deputy to please swear in our

19 defendant and then we will proceed.

20         **DEPUTY CLERK:**  Please stand and please raise your

21 right hand.

22                       ALEXUS PAIGE TYSON,

23                        was duly sworn.

24         **THE DEFENDANT:**  Yes.

25         **DEPUTY CLERK:**  Thank you.  You may put your hand

1  down.

2      May you please pull the mic and please speak loudly and

3  clearly into it.

4      Please state your full name for the record.

5          **THE DEFENDANT:**  Alexus Paige Tyson.

6          **DEPUTY CLERK:**  Can you please spell your first name?

7          **THE DEFENDANT:**  A-L-E-X-U-S.

8          **DEPUTY CLERK:**  Thank you.  What is your age?

9          **THE DEFENDANT:**  Twenty-seven years old.

10         **DEPUTY CLERK:**  And what year were you born?

11         **THE DEFENDANT:**  1996.

12         **DEPUTY CLERK:**  On April 22nd, 2022, you appeared

13  before United States Magistrate Judge Sullivan for the purpose

14  of arraignment, at which time you entered a plea of not guilty

15  to Count One of the indictment.

16      Do you wish to change your plea at this time?

17         **THE DEFENDANT:**  No.  Oh, yes.

18         **DEPUTY CLERK:**  How do you wish to plea?

19         **THE DEFENDANT:**  Guilty.

20         **DEPUTY CLERK:**  Guilty as to which count?

21         **THE DEFENDANT:**  Count One.

22         **DEPUTY CLERK:**  The plea is guilty to Count One of the

23  indictment; is that correct?

24         **THE DEFENDANT:**  Yes.

25         **DEPUTY CLERK:**  Thank you.  You may be seated.

5

1          **THE COURT:**  Thank you so much to our courtroom

2   deputy.

3      And Ms. Tyson, I will invite you to pull your microphone

4   down and close to you because the Court will be having a

5   conversation with you today, and I want to make sure that both

6   the Court and our court reporter can clearly hear your

7   responses to my questions.  Okay?

8      I just want to summarize the Court's understanding of the

9   charges against Ms. Tyson.

10     On January 27th of 2022, she was indicted and charged with

11  Count One, conspiracy to commit bank fraud and wire fraud in

12  violation of Title 18 U.S.C. 1349.  And Ms. Tyson has indicated

13  her intention today to plead guilty as to Count One of the

14  indictment.

15     I want to confirm, again, that's correct, Counsel?

16          **MR. DEMETRIOU:**  That is correct, Your Honor.

17          **THE COURT:**  And Ms. Tyson, you confer -- concur?

18          **THE DEFENDANT:**  Yes.

19          **THE COURT:**  Okay.  Very good.

20     Ms. Tyson, as your attorney may have shared with you

21  today, the Court is going to be asking you a number of

22  questions about yourself, about the charges brought against you

23  to make sure you understand those charges and the consequences

24  of your intention to plead guilty to those charges today.  And

25  so my questions will be aimed at making sure you're competent

**JA20**

6

1  to appear today, and that any plea you enter in connection with

2  this case is both knowing and voluntary.  Okay?

3         **THE DEFENDANT:**  Okay.

4      **THE COURT:**  And so I'm going to invite you to listen

5  very carefully to the questions I'm going to ask you, to answer

6  truthfully to the best of your ability, and clearly, in the

7  microphone, so that the Court can hear you.

8       And, also, if at any time you do not understand the Court

9  or do not understand a question, you can certainly feel free to

10  ask me to repeat it.  Or if you need to talk to your attorney,

11  just let me know and we will give you a chance to do that.

12  Okay?

13         **THE DEFENDANT:**  Okay.

14      **THE COURT:**  All right.  So we're going to begin with

15  some basic questions to make sure that you understand that --

16  first of all, do you understand that you are now under oath?

17         **THE DEFENDANT:**  Yes.

18      **THE COURT:**  Okay.  And do you understand that if you

19  answer any of my questions falsely today, your answers may

20  later be used against you for a prosecution for either perjury

21  or making a false statement to this court?

22         **THE DEFENDANT:**  Yes.

23      **THE COURT:**  Can you tell me how far you went in

24  school?

25         **THE DEFENDANT:**  I went up to Allegany -- well,

**JA21**

```
 1  college.
 2            THE COURT:  You went to college?
 3            THE DEFENDANT:  Yes.
 4            THE COURT:  Where did you go to college?
 5            THE DEFENDANT:  Allegany Community College.
 6            THE COURT:  Allegany Community College?
 7            THE DEFENDANT:  Yes.
 8            THE COURT:  And how many years did you attend there?
 9            THE DEFENDANT:  I did two years.
10            THE COURT:  Did two years.
11      Did you receive an associate's degree?
12            THE DEFENDANT:  No, I had came -- transferred, and
13  went to Montgomery.  Came back home and went to Montgomery
14  Community College.
15            THE COURT:  Okay.  And did you finish any degree
16  there?
17            THE DEFENDANT:  No, I didn't finish.
18            THE COURT:  Okay.  And how long ago was that?
19            THE DEFENDANT:  2016, '15.
20            THE COURT:  2016 -- okay.  Okay.
21      Are you having any trouble understanding the Court this
22  afternoon?
23            THE DEFENDANT:  No.
24            THE COURT:  Okay.  You can hear me okay?
25            THE DEFENDANT:  Yes.
```

1      **THE COURT:**  All right.  Have you been treated

2  recently for any mental illness, Ms. Tyson?

3      **THE DEFENDANT:**  No.

4      **THE COURT:**  What about for any drug or substance

5  addiction?

6      **THE DEFENDANT:**  No.

7      **THE COURT:**  What about alcohol addiction?

8      **THE DEFENDANT:**  No.

9      **THE COURT:**  Are you under the influence of any drug

10  or medication this afternoon?  And that could include a

11  prescription drug you might be taking.

12      **THE DEFENDANT:**  No.

13      **THE COURT:**  Okay.  My next question is for your

14  attorney.

15      Counsel, is there any question in your mind that your

16  client is competent to participate in today's proceedings?

17      **MR. DEMETRIOU:**  No, Your Honor.

18      **THE COURT:**  Very good.  Then we will proceed.

19      Ms. Tyson, have you had a chance to discuss the charges

20  brought against you in the indictment in this case with your

21  attorney?

22      **THE DEFENDANT:**  Yes.

23      **THE COURT:**  And do you understand those charges?

24      **THE DEFENDANT:**  Yes.

25      **THE COURT:**  We're going to talk a little bit about

1   them today, but I first want to ask, are you satisfied with the

2   legal representation that's been provided by your attorneys?

3              **THE DEFENDANT:**  Yes.

4             **THE COURT:**  Do you believe they have given you good

5   advice in this case?

6              **THE DEFENDANT:**  Yes.

7             **THE COURT:**  Do you believe they have been zealous or

8   strong advocates on your behalf in this case?

9              **THE DEFENDANT:**  Yes.

10            **THE COURT:**  Very good.  Pleased to hear that as well.

11      Counsel, I'm now going to turn to the plea agreement.

12   I'll have a question for counsel, and then we'll be talking

13   about various items in that agreement.

14      So, again, I do invite counsel for the defense to please

15   have a copy of the plea handy because, Ms. Tyson, I want you to

16   read along with the Court.

17      My first question for counsel, and I will start with the

18   government, I understand that there is a plea agreement in this

19   case; is that correct?

20            **MR. GARDNER:**  That's correct, Your Honor.

21            **THE COURT:**  Does the defense concur?

22            **MR. DEMETRIOU:**  Yes, Your Honor.

23            **THE COURT:**  Okay.  And the Court also does have a

24   copy of the plea agreement at the bench, and this agreement

25   will be marked as Government's Exhibit Number 1 in order

**JA24**

```
 1   received at the conclusion of today's hearing.  And I have
 2   reviewed it and note that it has been signed by representatives
 3   of the United States of America, as well as the defendant and
 4   her counsel.
 5       We'll talk in a moment about the other portion of the plea
 6   agreement, but for now, I just want to focus on the public
 7   portion.
 8       Ms. Tyson, have you had a chance to read and discuss the
 9   plea agreement with your attorney?
10            THE DEFENDANT:  Yes.
11            THE COURT:  Did you do that before you signed the
12   agreement?
13            THE DEFENDANT:  Yes.
14            THE COURT:  And have you had a chance to review each
15   and every term of the plea agreement with your counsel?
16            THE DEFENDANT:  Yes.
17            THE COURT:  And, again, do you believe you understand
18   the terms of the plea agreement?
19            THE DEFENDANT:  Yes.
20            THE COURT:  Okay.  And we're going to talk in detail
21   about what's in the plea agreement, but for right now, the
22   Court understands that under the terms of your plea agreement,
23   you are agreeing to plead guilty as to Count One of the
24   indictment; is that correct?
25            THE DEFENDANT:  Yes.
```

**JA25**

 1          **THE COURT:**  The Court will also note there's a

 2    supplement to the plea agreement, which is also a part of the

 3    agreement.  We'll discuss that a little bit later.  But that

 4    will also be reflected in some of the Court's questions today

 5    to Ms. Tyson.

 6        Ms. Tyson, have I correctly summarized your plea agreement

 7    as you understand it, again, the plea agreement that should be

 8    in front of you at table, as well as the sealed supplement?

 9          **THE DEFENDANT:**  Yes.

10          **THE COURT:**  And I'm going to ask this question in a

11    different way, but it's the same question.

12        Do you agree that Government Exhibit Number 1, again,

13    that's the plea agreement which should be before you at table,

14    together with the sealed supplement, which should also be

15    before you at table, sets out the entire agreement that you

16    have made with the government, and that there are no other

17    agreements or promises that have been made between you and the

18    government?

19          **THE DEFENDANT:**  Yes.

20          **THE COURT:**  Ms. Tyson, has anyone made any promises

21    or assurances to you that are not contained in your plea

22    agreement?

23          **THE DEFENDANT:**  No.

24          **THE COURT:**  Has anyone made any threats or threatened

25    to use force or violence towards you or maybe someone close to

**JA26**

1   you to persuade you to plead guilty today?

2           THE DEFENDANT:  No.

3           THE COURT:  Do you understand that this court is

4   not -- is not a party to your plea agreement?

5           THE DEFENDANT:  Yes.

6           THE COURT:  And do you understand if the Court

7   chooses to follow any terms of the plea agreement that are not

8   binding upon the Court, the Court, again, is not bound by those

9   terms?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Ms. Tyson, are you pleading guilty today

12  because of your own free will because you are, in fact, guilty?

13          THE DEFENDANT:  Yes.

14          THE COURT:  I would like to talk briefly at this

15  time, as the Court's consistent practice is, I have a brief

16  sealed portion of today's proceedings.  I'm going to have to

17  close the courtroom to those visiting for just a brief moment.

18  I'll ask you to please step out.  We do have two individuals

19  joining us.  And once they do that, we'll handle that business

20  and then they can come back in.

21      I'm sorry.  I thought I heard someone say something.

22          COURT SECURITY OFFICER:  They were asking me a

23  question. Your Honor.

24          THE COURT:  Okay.  Thank you.

25      (Conference on the sealed record.)

1    (It is the policy of this Court that every guilty plea and

2 sentencing proceeding include a bench conference concerning

3 whether the defendant is or is not cooperating.)

4    (The following was held in open court:)

5        **THE COURT:**  Ms. Tyson, the offense for which you are

6 pleading guilty today is a felony offense.  And if the Court

7 accepts your guilty plea as it relates to this offense, you

8 will be adjudged guilty of that offense.  And that adjudication

9 may deprive you of valuable civil rights, such as the right to

10 vote; the right to hold public office; the right to serve on a

11 jury; the right to obtain or keep certain benefits, like

12 student loan benefits or public housing assistance; and the

13 right to obtain certain permits and licenses, including the

14 possession of a firearm.

15    I want to ask you a series of questions that focus

16 particularly on these important fundamental rights, again, to

17 satisfy myself that you are aware of these rights and know you

18 waive these rights by pleading guilty today.

19    So, again, please listen very carefully to my questions.

20 If you do not understand the Court, let me know.  And, also, if

21 you wish to confer with your counsel, just let the Court know

22 as well.  Okay?

23        **THE DEFENDANT:**  Okay.

24        **THE COURT:**  My first question is, do you understand

25 that you may lose all the rights I just described to you if you

1  plead guilty today?

2          **THE DEFENDANT:**  Yes.

3          **THE COURT:**  Again, you've indicated you intend to

4  plead guilty as to Count One of the indictment.  This is

5  conspiracy to commit bank fraud and wire fraud in violation of

6  Title 18 U.S.C. Section 1349.  I would like to review for you

7  now the maximum penalties for this particular offense, and you

8  can find that information at the top of Page 2 of your plea

9  agreement, if you want to read along with the Court.

10      The maximum possible penalty for this case is 30 years'

11  incarceration; five years of supervised release following your

12  release from incarceration; there's also a maximum fine of

13  $1 million; and there is the mandatory $100 special assessment

14  that applies to your case.

15      Ms. Tyson, do you understand these maximum penalties?

16          **THE DEFENDANT:**  Yes.

17          **THE COURT:**  Do you also understand that if the Court

18  were to sentence you to a period of supervised release, while

19  you are on supervised release, you would be subject to the

20  supervision of the probation office in this district?

21          **THE DEFENDANT:**  Yes.

22          **THE COURT:**  And do you understand that you will be

23  required to comply with certain conditions of your supervision?

24          **THE DEFENDANT:**  Yes.

25          **THE COURT:**  Do you understand if you violate the

**JA29**

1   terms and conditions of your supervised release, you could be

2   returned to prison for a term that may be as great as the term

3   of your supervised release?

4           **THE DEFENDANT:**  Yes.

5       **THE COURT:**  And do you also understand that upon your

6   return to prison, you may not be given credit for your street

7   time?

8           **THE DEFENDANT:**  Yes.

9       **THE COURT:**  Ms. Tyson, I want to talk about a few

10  particular matters that are in your plea agreement.  First, on

11  Page 6, if you want to flip with the Court, there's language

12  that talks about forfeiture, and we'll talk about this more at

13  a potential sentencing hearing, but I want to highlight it for

14  you right now.

15      Paragraphs 11 through 15, do you understand that under the

16  terms of your plea agreement, this Court may order you to

17  forfeit certain assets that are directly traceable to your

18  offense?

19          **THE DEFENDANT:**  Yes.

20      **THE COURT:**  I also -- I also want to bring to your

21  attention Paragraph 16 through 17 of your plea agreement.

22  That's on Page 17 -- I'm sorry, Page 7 of the plea agreement,

23  as it relates to abandonment.  If you want to read with me

24  towards the top of paragraph -- I'm sorry, the top of Page 7.

25      Do you understand that under the terms of your plea

**JA30**

agreement, the Court may also order you to waive any right,
title and interest in a Brother printer bearing Model Number
MFC-8890D1, and that you consent to the federal administrative
disposition, official use and/or destruction of that printer?

          **THE DEFENDANT:**  Yes.

          **THE COURT:**  I also want to talk to you about the
restitution provision in your plea agreement.  That's towards
the middle of Page 7, Paragraph 18.

    Do you understand that under Paragraph 18 of your plea
agreement, this Court may order you to pay restitution to any
victims of your crime?

          **THE DEFENDANT:**  Yes.

          **THE COURT:**  In particular, do you understand the
Court may order you to pay the full amount of the victims'
losses in this case, which is estimated to be at least
$129,967.22?

          **THE DEFENDANT:**  Yes.

          **THE COURT:**  And, again, do you understand that you
must pay the mandatory $100 special assessment if you plead
guilty today?

          **THE DEFENDANT:**  Yes.

          **THE COURT:**  Ms. Tyson, do you understand that this
Court may also require you to provide notice of your conviction
to any third parties, including any victims of your crime, if
you plead guilty today?

**JA31**

17

1          **THE DEFENDANT:**  Yes.

2          **THE COURT:**  And, again, do you understand all the

3  things I've just described to you are possible consequences if

4  you enter a plea of guilty?

5          **THE DEFENDANT:**  Yes.

6          **THE COURT:**  Ms. Tyson, I want to talk a little bit

7  about sentencing and how the Court will address sentencing in

8  your case.

9      As your attorney may have explained to you, there will be

10  a separate legal proceeding in this Court that addresses

11  sentencing.

12      There is some information in your plea agreement that

13  reflects what the parties believe the impact of the sentencing

14  guidelines might be on your case, so I just want to review that

15  information with you to make sure you are aware of it and

16  understand it.

17      If you want to read along with me, I'm on Page 4 of the

18  plea agreement, towards the middle, at Paragraph 6.

19      As I indicated, your sentence will be determined by this

20  Court after consulting the United States Sentencing Guidelines.

21  These are advisory guidelines that I will consider.  I will

22  also consider possible departures from those guidelines as

23  allowed by federal law, as well as certain what we call

24  variance factors under Title 18 U.S.C. 3553(a).  These are

25  factors that Congress has instructed me to consider before

**JA32**

1  imposing sentence in your case.

2      And my first question for you, Ms. Tyson, have you had a

3  chance to talk with your attorney about how the sentencing

4  guidelines might apply to your case?

5          **THE DEFENDANT:**  Yes.

6          **THE COURT:**  Okay.  Let's take a look at some of the

7  information the parties have agreed to in your plea agreement.

8      Based upon the parties' agreement and your plea agreement,

9  the base offense level for your case is expected to be seven,

10 and this is under Section 2B1.1(a) of the sentencing

11 guidelines.  The parties also note a number of adjustments to

12 that figure.  First, the offense level would be increased by

13 eight under Section 2B1.1(b)(1)(E) of the guidelines.  The

14 parties also note that the offense level is then increased by

15 two, pursuant to Section 2B1.1(b)(11) of the guidelines.

16 There's an additional 2-point level increase under Section

17 3B1.3 of the guidelines.  And lastly, there's a two-level

18 reduction under 3E1.1(a) of the guidelines.

19     The government has also indicated in the plea agreement it

20 agrees to make a motion to allow for an additional one-level

21 reduction, under Section 3E1.1(b) of the guidelines, which

22 would produce, I believe, a final offense level of 16.

23     Again, we'll talk about this in much greater detail at

24 sentencing, and it may not be exactly where we end up, but I

25 want to make sure that you're aware of these calculations in

**JA33**

```
 1  your plea agreement.
 2       My next question for Ms. Tyson, do you understand that the
 3  Court will not be able to finally determine the guideline range
 4  for your case until after a presentence report has been
 5  prepared?
 6            THE DEFENDANT:  Yes.
 7       THE COURT:  And do you understand that you and your
 8  lawyer will have a chance to review and challenge that report
 9  before we hold a sentencing hearing?
10            THE DEFENDANT:  Yes.
11       THE COURT:  Do you understand the government will
12  also have a chance to review and object to that report prior to
13  your sentencing hearing?
14            THE DEFENDANT:  Yes.
15       THE COURT:  Do you understand that any criminal
16  history that you may have will affect the Court's computation
17  of your sentence under the sentencing guidelines?
18            THE DEFENDANT:  Yes.
19       THE COURT:  And do you understand, again, that in
20  addition to considering the sentencing guidelines, any
21  departures from those guidelines, as well as the variance
22  factors under federal law, the Court, again, will look to make
23  sure that any sentence imposed is not greater than needed to
24  comply with the -- comply with the requirements of sentencing?
25            THE DEFENDANT:  Yes.
```

1      **THE COURT:**  Ms. Tyson, do you understand that any

2   sentence the Court imposes may be different from the estimate

3   you received from your attorney?

4      **THE DEFENDANT:**  Yes.

5      **THE COURT:**  And do you understand that parole has

6   been abolished, and that if you are sentenced to a term of

7   incarceration, you will not be released on parole?

8      **THE DEFENDANT:**  Yes.

9      **THE COURT:**  Very good.

10   Ms. Tyson, I also want to talk a little bit about your

11   appeal rights and how they are impacted by your plea agreement.

12   I'm now going to read from Paragraph 10 of the plea agreement.

13   If you want to look along with me, I'm on Page 5 towards the

14   bottom, and I just want to review a few of the provisions in

15   here that deal with your appeal rights and any waiver you made

16   to those rights.

17   First of all, let's talk about Paragraph 10(a).  Do you

18   understand that under Paragraph 10(a) of your plea agreement,

19   you waive all rights to appeal your conviction in this case

20   upon any grounds unless under Title 28 U.S.C. Section 1291 or

21   any statute or constitutional provision?

22      **THE DEFENDANT:**  Yes.

23      **THE COURT:**  Let's next talk about Paragraph 10(b) of

24   the plea agreement.

25   Do you understand that under Paragraph 10(b) of the plea

1  agreement, you and the government waive your respective rights

2  to appeal whatever sentence is imposed in this case under Title

3  18 U.S.C. Section 3742?

4          **THE DEFENDANT:**  Yes.

5          **THE COURT:**  Now, I also want to highlight two

6  reservations of rights at the very top of Page 6, little i, if

7  you're with me.

8       Do you understand that under the plea agreement, you

9  reserve the right to appeal any term of imprisonment to the

10  extent that it exceeds the top of the final advisory guideline

11  range as calculated by the Court at your sentencing hearing?

12          **THE DEFENDANT:**  Yes.

13          **THE COURT:**  Next I want to ask you about Roman

14  Numeral -- double little i.

15       Do you also understand, under the terms of your plea

16  agreement, that United States Attorneys' Office reserves the

17  right to appeal any term of incarceration to the extent that it

18  is less than the bottom of the final advisory guideline range

19  as calculated by the Court at your sentencing hearing?

20          **THE DEFENDANT:**  Yes.

21          **THE COURT:**  And lastly, I want to talk about

22  Paragraph 10(c).

23       Do you understand that under Paragraph 10(c) of the plea

24  agreement, you waive all rights pursuant to the Freedom of

25  Information Act related to the investigation and prosecution of

1 your case?

2          **THE DEFENDANT:**  Yes.

3          **THE COURT:**  Very good.

4     Ms. Tyson, I also want to be sure that you know and

5 understand you will waive important fundamental rights if you

6 plead guilty, and so my next set of questions are going to

7 address those rights.  They are also discussed in your plea

8 agreement.  Please, again, listen carefully and answer

9 truthfully to the best of your ability.

10     And my first question is, do you understand that you are

11 not required to plead guilty in this case?

12          **THE DEFENDANT:**  Yes.

13          **THE COURT:**  And do you understand that you have the

14 right to plead not guilty to any offense charged against you

15 and to persist in your not guilty plea?

16          **THE DEFENDANT:**  Yes.

17          **THE COURT:**  Do you also understand that if you plead

18 not guilty, you would then have the right to a trial by a jury

19 right here in this courtroom?

20          **THE DEFENDANT:**  Yes.

21          **THE COURT:**  And do you understand that your lawyers,

22 as well as the government's lawyer, would help the Court in

23 selecting 12 members from this community who will serve as the

24 jurors in your case?

25          **THE DEFENDANT:**  Yes.

**JA37**

1          **THE COURT:** Do you understand that during your trial,

2    you would be presumed innocent?

3          **THE DEFENDANT:** Yes.

4          **THE COURT:** And do you understand that it would be

5    the government's burden to prove your guilt beyond a reasonable

6    doubt and to the unanimous satisfaction of the jury, and if the

7    government could not do so, you could not be convicted in this

8    case?

9          **THE DEFENDANT:** Yes.

10         **THE COURT:** Do you also understand that at your trial

11   and at every other critical stage in your case, you are

12   entitled to the assistance of a competent attorney to assist

13   you, to advise you, to represent you, and to advocate on your

14   behalf?

15         **THE DEFENDANT:** Yes.

16         **THE COURT:** Do you understand if you cannot afford an

17   attorney, one will be appointed to represent you by this Court

18   at no cost?

19         **THE DEFENDANT:** Yes.

20         **THE COURT:** Do you understand that during your trial,

21   you would have the right to see and hear all of the witnesses?

22         **THE DEFENDANT:** Yes.

23         **THE COURT:** And do you understand that you and your

24   attorney would be allowed to question, or what we call cross

25   examine, those witnesses testifying against you at trial?

1          **THE DEFENDANT:**  Yes.

2          **THE COURT:**  Do you understand that you would also
3   have the right to present the testimony of your own witnesses
4   at trial?

5          **THE DEFENDANT:**  Yes.

6          **THE COURT:**  And do you understand if these witnesses
7   would not come to court voluntarily, you would be allowed to
8   subpoena them, to force them to come to your trial and to
9   testify?

10         **THE DEFENDANT:**  Yes.

11         **THE COURT:**  Do you understand that you would also
12  have the right to testify yourself at your trial?

13         **THE DEFENDANT:**  Yes.

14         **THE COURT:**  And do you understand you have the right
15  to decline to testify at your trial?

16         **THE DEFENDANT:**  Yes.

17         **THE COURT:**  Do you understand if you decline to
18  testify at your trial, that fact could not be held against you
19  in any way?

20         **THE DEFENDANT:**  Yes.

21         **THE COURT:**  Do you understand if you elected to
22  present no defense at all at your trial, again, that could not
23  be held against you in any way?

24         **THE DEFENDANT:**  Yes.

25         **THE COURT:**  Ms. Tyson, do you understand that if you

**JA39**

```
 1  were convicted after a trial by jury, you could appeal that
 2  conviction to a higher court?
 3               THE DEFENDANT:  Yes.
 4          THE COURT:  And my last question for you on this
 5  topic, do you understand that after you enter a plea of guilty
 6  today, if this court accepts your plea, there will be no trial
 7  in your case, and you will have waived or given up all of the
 8  rights I have just described to you?
 9               THE DEFENDANT:  Yes.
10          THE COURT:  Very good.
11      Ms. Tyson, again, you've indicated you intend to plead
12  guilty as to Count One of the indictment.  I want to summarize
13  the essential elements of that offense.  I believe you can find
14  that information on Page 1 of the plea agreement as well.
15      The essential elements of the offense are as follows:
16      You and at least one other person entered the unlawful
17  agreement to conspire to commit bank fraud and wire fraud; and
18  secondly, you knowingly and willfully became a member of that
19  conspiracy.
20      And again, you can see that towards the bottom of Page 1
21  of your plea agreement.
22      Ms. Tyson, do you understand that these are the essential
23  elements of the offense?
24               THE DEFENDANT:  Yes.
25          THE COURT:  Do you also understand if the government
```

**JA40**

```
 1  could not prove each and every one of these elements, again,

 2  beyond a reasonable doubt and to the unanimous satisfaction of

 3  the jury, you could not be convicted of Count One?

 4          THE DEFENDANT:  Yes.

 5          THE COURT:  Ms. Tyson, before the Court can accept

 6  your guilty plea this afternoon, I must also be satisfied that

 7  there is a factual basis for that plea.  I'm going to invite

 8  you now to listen carefully as AUSA Gardner shares what he

 9  believes he could prove if there was a trial in this case.

10      AUSA Gardner?

11          MR. GARDNER:  Thank you, Your Honor.

12      The parties agree that if this case had proceeded to

13  trial, the government would have proven the following facts

14  beyond a reasonable doubt:

15      The defendant, Alexus Paige Tyson, conspired with Travis

16  Osita Nnamani and Brianna Lee Cartledge to defraud Bank of

17  America and other financial institutions by creating fake

18  checks based on information that Tyson intercepted while

19  employed with the United States Post Office.

20      At the times relevant to this case, Tyson was a resident

21  of Maryland and employed in Washington, D.C., as a United

22  States Postal Service carrier.  The victim banks were financial

23  institutions within the meaning of 18 U.S.C. 20 in that their

24  deposits were insured by the Federal Deposit Insurance

25  Corporation.
```

**JA41**

1    Tyson, Cartledge and other co-conspirators utilized their
2    positions as USPS employees to wrongfully access USPS money
3    orders and individual mail in the possession of the USPS in
4    order to obtain unlawfully and without authorization personal
5    information of victim individuals and victim businesses.
6        Nnamani, on his own, and with the assistance of other
7    co-conspirators, created false and fraudulent checks drawn on
8    the bank accounts of the victim individuals whose information
9    Nnamani received from Tyson, Cartledge and other
10   co-conspirators.
11       Nnamani, Tyson, Cartledge, and their co-conspirators
12   fraudulently negotiated the false checks at the victim
13   financial institutions.
14       Tyson participated in the conspiracy from on or about
15   July 29th, 2019, to on or about October 7th, 2020.
16       During the scheme, Tyson sent Nnamani images of at least
17   nine separate checks that contained personal identifying
18   information with the intent that the information be used in
19   order to create fake checks and steal from victim accounts.
20   Tyson abused her position of trust as a USPS mail carrier in a
21   manner that significantly facilitated the commission or
22   concealment of the crime.
23       On or about October 19th, 2019, Nnamani sent a text
24   message to Tyson requesting that she "please take pics of
25   checks for me today" and instructing Tyson to open a letter

**JA42**

containing a check, photograph the check, send the photograph
to Nnamani, and then reseal and deliver the mail containing the
check.

Tyson did so and sent an image of a Liberty Mutual
CitiBank check with check number ending 3595.

Nnamani sent images through text message to Tyson
demonstrating how he washed and counterfeited the Liberty check
Tyson had just send him.

Tyson sent a text message to Nnamani in response asking,
"How you splitting the money?" and "So how much I'm getting?"

Nnamani responded, in part, "I deposit this in a bank
account," and he was "about to cook this one up."

Nnamani sent a text message to Tyson, "Lovuah, I just made
a drop for 2468 on this Capital One with that food.  I pray to
God it pop on," referring to the Liberty check.

The investigation revealed that Nnamani did, in fact, then
deposit the Liberty check at a Capital One bank branch for four
thousand -- or $2,468.

On or about October 11th, 2019, Tyson sent a text message
to Nnamani stating, "Can you help me make 50 bands?"  "Band"
being a slang word for $1,000.

Nnamani responded on or about October 16th, 2019, with
"Send me your first and last name so I can get this started,"
to which she responded with Alexus Tyson.

On or about October 17th, 2019, Tyson deposited a

counterfeit check for $9,500 into a PNC Bank account that was
drawn upon the personal checking account of Victim A.  On that
same day, she was -- she also deposited another counterfeit
check for $8,000 into another PNC account that was drawn upon
the personal checking account of Victim A.  These checks were
provided to Tyson by Nnamani and written from a checkbook he
created with Victim A's information.  These checks were
deposited into Tyson's personal PNC accounts.

On or about October 18th, 2019, Nnamani sent Tyson a text
saying "withdrawal from $8,000 from growth, 9,500 from spend,"
to which she replied, "they only letting me do 5,000."

Since the transaction was taking a long time, Nnamani
texted Tyson, "ask if you can speak to her or call me, verify
right then and there, because it's too long."

While the checks in question had Victim A's account
information, they had Nnamani's personal cell number that the
bank could reference to verify the check.

On or about October 24th, 2019, Tyson sent Nnamani a check
asking, "How was you splitting it so I can put it in this other
account?"

To which he responded, "Take 3,500 and put it in the other
account."

On or about September 2nd, 2020, Tyson arranged a meeting
with Nnamani and seven USPS employees at a restaurant in
Greenbelt, Maryland, to similarly recruit them to participate

**JA44**

 1  in this scheme.  Nnamani subsequently referenced the meeting in

 2  an electronic conversation wherein he discussed having a

 3  meeting with eight postal workers and that he needed IDs to

 4  cash federal stimulus checks.

 5      Nnamani provided images of several stimulus checks during

 6  the electronic communications.

 7      On or about September 4th, 2020, Tyson provided Nnamani

 8  with an image of a United States Treasury tax refund check in

 9  the amount of $15,070.28.

10      On or about September 15th, 2020, Nnamani sent Tyson a

11  text message which contained an image of a Chase Bank deposit

12  receipt showing that the Treasury refund check had been

13  deposited.

14      On October 7th, 2020, Nnamani sent Tyson a text message

15  about the refund check saying "they need somebody to verify as

16  the person, so I want to be Lauren and James."

17      Also on or about September 15th, 2020, Tyson sent text

18  messages to Nnamani stating, "I have a BOA check, 1,000, don't

19  have pic," and that it was a company check.

20      On October 7th, 2020, Nnamani sent a text message to Tyson

21  saying, "Obviously you must be retarded thinking I ran off and

22  the money is still there.  So if you want to walk in or got

23  somebody to walk in and act like them, cool.  14K is there.

24  They need somebody to verify as the person.  So I want to be

25  Lauren and James, cool?"

**JA45**

1      This message refers to the aforementioned refund check in

2  the amount of $15,070.28.  The original, legitimate recipients

3  for the check were Lauren and Justin.

4      The actual loss due to Tyson's direct participation in the

5  fraudulent scheme was at least $35,038.28.  In total, the

6  foreseeable intended loss during Tyson's participation in the

7  fraudulent scheme was at least $129,967.22.

8      Thank you.

9          **THE COURT:**  Thank you so much, AUSA Gardner.

10     And the Court will just note, for the record, that

11  Attachment A to the plea agreement is a stipulation of facts

12  which reflects the facts just recited by the government in

13  today's proceedings.

14     I will also note that the copy that the Court has of the

15  stipulation of facts has been signed by the defendant and her

16  counsel but is not signed by the United States.  So if we have

17  a copy that's fully signed?

18          **MR. GARDNER:**  There was one provided at the beginning

19  of this hearing, Your Honor.

20          **THE COURT:**  Okay.  Thank you.  I will make sure we

21  have that.

22     Thank you so much, and thank you, AUSA Gardner, for that

23  matter.

24     Ms. Tyson, my next question is for you.  You've now heard

25  the government share what it believes it could prove if there

1  were a trial in your case.

2      And so my question for you, if there were a trial in this

3  case, could the government prove the facts that you just heard?

4          **THE DEFENDANT:**  Not -- yes; yes.

5          **THE COURT:**  You're answering yes?

6          **THE DEFENDANT:**  Yes.

7          **THE COURT:**  Okay.  Thank you so much.

8      Counsel, I believe I'm at the point where I'm going to

9  discuss final acceptance of the guilty plea, and then the Court

10  will rule, unless there's anything else that we need to talk

11  about before we get to that point.

12      Ms. Tyson, I have just a few more questions for you.

13          **THE DEFENDANT:**  Okay.

14          **THE COURT:**  And my first question is, do you

15  understand that if the Court accepts your guilty plea, the

16  Court will refer your case to the United States Probation

17  Office for the District of Maryland, and that office will

18  prepare a presentence investigative report about your case?

19          **THE DEFENDANT:**  Yes.

20          **THE COURT:**  And do you understand that only after I,

21  as a judge in your case, have reviewed that report, and after

22  you and your counsel, as well as the government, have reviewed

23  that report and provided any objections, will the Court hold

24  your sentencing hearing?

25          **THE DEFENDANT:**  Yes.

```
 1          THE COURT:  At this time, I'm going to invite
 2   Ms. Tyson to please stand, along with her counsel, and I will
 3   have one final question for her.  And if you want to adjust the
 4   microphone to make sure we can hear your answer clearly when
 5   you are standing.
 6        Ms. Tyson, how do you plead as to Count One of the
 7   indictment in this case, guilty or not guilty?
 8          THE DEFENDANT:  Guilty.
 9        THE COURT:  Thank you so much.  Defendant's plea is
10   guilty as to Count One of the indictment.  You may be seated.
11        The Court will now issue its ruling as to the defendant's
12   guilty plea.
13        It is the finding of this Court that in the matter of
14   United States of America v. Nnamani, et al., the defendant,
15   Alexus Paige Tyson, is fully competent and capable of entering
16   an informed plea, that the defendant is aware of the nature of
17   the charges and the consequences of her guilty plea; and that
18   her guilty plea is a knowing and voluntary plea that is
19   supported by an independent basis in fact containing each of
20   the essential elements of that offense.
21        The plea is, therefore, accepted by this Court except for
22   its nonbinding terms.  The plea agreement upon which the guilty
23   plea is predicated -- predicated is also accepted, and the
24   defendant is now adjudged guilty of the offense contained
25   therein.
```

**JA48**

34

```
 1        As I indicated earlier, a written presentence report will

 2   be prepared by our probation office.  Ms. Tyson, you're

 3   instructed to provide that office with the information that it

 4   seeks to prepare that report.  Your counsel may join you and

 5   help you in that endeavor.

 6        And, again, the parties will be allowed to file any

 7   objections to that report before we hold a sentencing hearing

 8   in this matter.

 9        I would also just like to briefly talk about the

10   sentencing hearing, in terms of when we can schedule that

11   hearing.  I believe my chambers may have reached out to counsel

12   and proposed some dates.  I'm going to share the date that I

13   have to make sure it still works for counsel, and that date is

14   April 4th of 2024 at 2:30 p.m. here in Greenbelt.

15        Does that date work -- well, let me ask the defense first,

16   because we can't go without you.  Does that date work for the

17   defense, April 4th, 2024, 2:30 p.m. here in Greenbelt?

18             MR. DEMETRIOU:  Yes, Your Honor.

19             THE COURT:  Okay.  AUSA Gardner?

20             MR. GARDNER:  That works for the government, Your

21   Honor.

22             THE COURT:  Okay.  We have a date.  And that will be

23   the date of our sentencing hearing, and the Court will issue an

24   order, shortly, reflecting that date.  There will be a number

25   of deadlines that will flow from that date to prepare us for
```

 1  sentencing.

 2      I want to highlight, first of all, the defendant, of

 3  course, must be present for the sentencing hearing, and she

 4  will also have a chance to address the Court at that hearing,

 5  as well as counsel, to present any arguments they wish to

 6  present to the Court.

 7      The parties are also permitted to present other evidence

 8  or witnesses, if you wish, in support of your positions on

 9  sentencing.  And I would ask that you just let the Court know,

10  if you're going to do that, ahead of time so we can make those

11  arrangements.

12      Also, please be advised that character letters, or other

13  materials that you wish the Court to consider, must be received

14  by this Court no later than five days prior to the hearing.  So

15  that would be, I think, roughly, the very end of March.  Any

16  correspondence received after that point will not be considered

17  by the Court in connection with sentencing.

18      Again, during the hearing, Ms. Tyson and her counsel will

19  both have a right to speak and address the Court before

20  sentence is imposed, and any victims who wish to address the

21  Court may also address the Court before I will impose sentence.

22      I believe the defendant is not in custody and has been

23  under supervision.  The Court did receive a report about her

24  supervision, which generally shows as satisfactory.

25      Are there any requests to modify her conditions of

**JA50**

```
 1  supervision, pending sentencing, from either side?

 2          MR. GARDNER:  No, Your Honor.

 3          MR. DEMETRIOU:  No, Your Honor.

 4       THE COURT:  Okay.  Then you will continue on the same

 5  conditions of supervision pending your sentencing in this

 6  matter.

 7      Ms. Tyson, of course, you're obligated to comply with all

 8  of those requirements.  The Court will get an update, prior to

 9  your sentencing hearing, about how you've done with that.

10      I have the sentencing order in front of me.  Again, I'll

11  set the sentencing hearing for April 4th, 2024, at 2:30 p.m.

12  I'm going to sign that order now, and that will be filed on the

13  docket shortly.  So, Counsel, you will need to see all the

14  other deadlines that we'll need to accomplish prior to

15  sentencing.

16      With that, is there anything else that we need to discuss

17  or address, before adjourning today, from the perspective of

18  the United States?

19          MR. GARDNER:  No, Your Honor.

20       THE COURT:  Anything further from the defense?

21       MR. DEMETRIOU:  No; thank you, Your Honor.

22       THE COURT:  Okay.  Well, Counsel, thank you so much

23  for your time.  I look forward to seeing you both here in

24  April.

25      Ms. Tyson, thank you for your presence here today as well.
```

1    With that, I believe we can stand adjourned.

2         **DEPUTY CLERK:**  Please rise, this Honorable Court

3    stands adjourned.

4    (Proceedings were concluded at 3:11 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**JA52**

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4       I, Paula J. Leeper, Federal Official Court Reporter, in

 5  and for the United States District Court for the District of

 6  Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

 7  the foregoing is a true and correct transcript of the

 8  stenographically-reported proceedings held in the

 9  above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                          Dated this 5th day of June 2024.

13

14

15              /S/ Paula J. Leeper

16       _____

17              Paula J. Leeper, RPR
                Federal Official Reporter
18

19

20

21

22

23

24

25
```

**JA53**



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | | |
|---|---|---|---|
| **G. Michael Morgan, Jr.** | *Mailing Address* | *Office Location* | *DIRECT* 301-344-0106 |
| *Assistant United States Attorney* | *6500 Cherrywood Lane, Suite 200* | *6406 Ivy Lane, 8th Floor* | *MAIN* 301-344-4433 |
| *Michael.Morgan5@usdoj.gov* | *Greenbelt, MD 20770-1249* | *Greenbelt, MD 20770-1249* | *FAX* 301-344-4516 |

September 19, 2023

Michael E. Lawlor, Esq.
Brennan, McKenna & Lawlor, Chartered
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770

_____ FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

JAN 0 4 2024

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ____ DEPUTY

Re: <u>United States v. Alexus Paige Tyson,</u>
Criminal No. LKG-22-023

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Alexus Paige Tyson (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **5:00 p.m. on September 29, 2023**, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offense of Conviction</u>

1.     The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with Conspiracy to Commit Bank Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

<u>Elements of the Offense</u>

2.     The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland—(1) the Defendant and at least one other person entered the unlawful agreement charged in the Indictment, that is, conspiracy to commit bank fraud and wire fraud; and (2) the Defendant knowingly and willfully became a member of that conspiracy.

**JA54**

<u>Penalties</u>

3.      The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|-------|---------|----------------|----------------|--------------------|--------------|--------------------|
| 1 | 18 U.S.C. § 1349 | N/A | 30 years | 5 years | $1,000,000 | $100 |

a.      Prison:  If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.      Supervised Release:  If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c.      Restitution:  The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.      Payment:  If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d).  The Defendant may be required to pay interest if the fine is not paid when due.

e.      Forfeiture:  The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.      Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

**JA55**

<u>Waiver of Rights</u>

4.     The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

    a.     If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b.     If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c.     If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

    d.     The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

    e.     If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

    f.     By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

    g.     If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further

3

**JA56**

trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

        h.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

<u>Advisory Sentencing Guidelines Apply</u>

    5.    The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742€) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

<u>Factual and Advisory Guidelines Stipulation</u>

    6.    This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

        a.     This Office and the Defendant further agree that the applicable base offense level is **7**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(1).

        b.     A **8**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(E), because the intended loss was more than $95,000 but not more than $150,000.

        c.     A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(11), because the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification.

        d.     A **2**-level increase applies, pursuant to U.S.S.G. § 3B1.3, because the Defendant abused a position of trust.

        e.     This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level, pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal

conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional 1-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.     There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

<u>Obligations of the Parties</u>

9.     At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing.

<u>Waiver of Appeal</u>

10.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s), to the extent that such challenges legally can be waived.

b.     The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the

5

**JA58**

Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

       i.     The Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds the top of the final advisory guidelines range as calculated by the Court at sentencing; and

       ii.     This Office reserves the right to appeal any term of imprisonment to the extent that it is less than the bottom of the final advisory guidelines range as calculated by the Court at sentencing.

      c.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

<u>Forfeiture</u>

11.     The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offenses, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12.     Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in any money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities.

13.     The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. This Office agrees to seek the Attorney General's approval to apply forfeited assets to the Defendant's Restitution Order.

14.     The Defendant agrees to assist fully in the forfeiture of the property described above. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas

6

**JA59**

corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Abandonment

16.     The Defendant knowingly and voluntarily waives any right, title, and interest in the following property:  a Brother Printer bearing model number MFC-8890DW (the "Abandoned Property") and consents to its federal administrative disposition, official use, and/or destruction.

17.     The Defendant understands that she would have a right to file a claim to the Abandoned Property and waives his right to claim the Abandoned Property.  The Defendant agrees not to contest the vesting of title of the Abandoned Property in the United States Government and agrees to unconditionally release and hold harmless the United States Government, its officers, employees, and agents, from any and all claims, demands, damages, causes of actions, suits, of whatever kind and description, and wheresoever situated, that might now exist or hereafter exist by reason of or growing out of or affecting, directly or indirectly, the seizure or waiver of ownership interest in the Abandoned Property.  The Defendant agrees to execute any documents as necessary to the waiver of right, title and interest in the Abandoned Property, including any forms necessary to effect the Defendant's waiver of ownership interest.

Restitution

18.     The Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses, which is **at least $129,967.22**, in U.S. currency.  The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that she will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

Collection of Financial Obligations

19.     The Defendant expressly authorizes the U.S. Attorney's Office for the District of Maryland to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office for the District of Maryland, in a form this Office prescribes and as it directs. The Defendant

7

**JA60**

promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

<u>Defendant's Conduct Prior to Sentencing and Breach</u>

20.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

21.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

<u>Court Not a Party</u>

22.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

<u>Entire Agreement</u>

      23.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

      If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

                Very truly yours,

                Erek L. Barron
                United States Attorney

                G. Michael Morgan, Jr.
                Assistant United States Attorney

      I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

9.29.2023
Date

                             Alexus Paige Tyson
                             Defendant

      I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

9/29/23
Date

                             Michael E. Lawlor, Esq.
                             Counsel for Defendant

**JA62**

10

JA63

FILED
LOGGED
ENTERED
RECEIVED

JAN 04 2024



AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

**ATTACHMENT A**

**STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Defendant, **ALEXUS PAGE TYSON ("TYSON")** conspired with **Travis Osita Nnamani** ("**Nnamani**") and **Brianna Lee Cartledge** ("**Cartledge**") to defraud Bank of America and other financial institutions by creating fake checks based on information that **TYSON** intercepted while employed with the United States Post Office. At the times relevant to this case, **TYSON** was a resident of Maryland and employed in Washington, DC as a United States Postal Service ("USPS") Carrier. The victim banks were financial institutions within the meaning of 18 U.S.C. § 20 in that their deposits were insured by the Federal Deposit Insurance Corporation.

**TYSON**, **Cartledge**, and other co-conspirators utilized their positions as USPS employees to wrongfully access USPS money orders and individual mail in the possession of USPS in order to obtain, unlawfully and without authorization, personal information of victim individuals and victim businesses.

**Nnamani**, on his own and with the assistance of other co-conspirators, created false and fraudulent checks drawn on the bank accounts of the victim individuals whose information **Nnamani** received from **TYSON**, **Cartledge**, and other co-conspirators. **Nnamani**, **TYSON**, **Cartledge**, and their co-conspirators fraudulently negotiated the false checks at the victim financial institutions. **TYSON** participated in the conspiracy from on or about July 29, 2019 to on or about October 7, 2020. During the scheme, **TYSON** sent **Nnamani** images of at least nine separate checks that contained personal identifying information with the intent that the information be used in order to create fake checks to steal from victim accounts. **TYSON** abused her position of trust, as a USPS mail carrier, in a manner that significantly facilitated the commission or concealment of the crime.

On or about August 19, 2019, **Nnamani** sent a text message to **TYSON** requesting that she "please take pics of checks for me today," and instructing **TYSON** to open a letter containing a check, photograph the check, send the photograph to **Nnamani**, and then reseal and deliver the mail containing the check. **TYSON** did so and sent an image of a Liberty Mutual Citibank check with check number ending in 595 (the "Liberty Check"). **Nnamani** sent images through text message to **TYSON** demonstrating how he washed and counterfeited the Liberty Check **TYSON** had sent him. **TYSON** sent a text message to **Nnamani** in response asking, "how you splitting the money" and "So how much I'm getting." **Nnamani** responded by stating, in part, "I deposit this into a bank account," and that he was "about to cook this one up." **Nnamani** sent a text message to **TYSON** "Lovuah I just made a drop for 2468 on this capital one with that food I pray to god it pop on" (referring to the Liberty Check). The investigation revealed that **Nnamani** did, in fact, then deposit the Liberty Check at a Capital One Bank branch for $2,468.

11

**JA64**

On or about October 11, 2019, **TYSON** sent a text message to **Nnamani** stating "Can you help me make 50 bands?" "Band" is a slang word for $1,000. **Nnamani** responded on or about October 16, 2019 with "Send me your first n last name so I can get this started." To which she responded with "Alexus Tyson."

On or about October 17, 2019, **TYSON** deposited a counterfeit check for $9,500 into a PNC Bank account that was drawn upon the personal checking account of Victim A. On that same day she also, deposited another counterfeit check for $8,000 into another PNC Bank account that was drawn upon the personal checking account of Victim A. These checks were provided to **TYSON** by **Nnamani** and written from a checkbook he created with Victim A's information. These checks were deposited into **TYSON**'s personal PNC accounts. On or about October 18, 2019, **Nnamani** sent **TYSON** a text saying "Withdrawal from 8,000 from growth. 9,500 from spend" to which she replied, "They only letting me do 5000." Since the transaction was taking a long time, **Nnamani** texted **TYSON**, "Ask if u can speak to her or call me verify right then n there cuz it's too long." While the checks in question had Victims A's account information, they had **Nnamani**'s personal cell phone number that the bank could reference to verify the check. On or about October 24, 2019, **TYSON** sent **Nnamani** a text asking "How was you splitting it so I can put it in this other account" to which he responded "Take 3500 n put it in the other account."

On or about September 2, 2020, **TYSON** arranged a meeting with **Nnamani** and seven USPS employees at a restaurant in Greenbelt, Maryland, to similarly recruit them to participate in the scheme. **Nnamani** subsequently referenced the meeting in an electronic conversation wherein he discussed having a meeting with eight postal workers and that he needed IDs to cash federal stimulus checks. **Nnamani** provided images of several stimulus checks during the electronic communications.

On or about September 4, 2020, **TYSON** provided **Nnamani** with an image of a United States Treasury Tax Refund Check in the amount of $15,070.28. On or about September 15, 2020, **Nnamani** sent **TYSON** a text message which contained an image of a Chase Bank deposit receipt showing that the Treasury Refund check had been deposited. On October 7, 2020, **Nnamani** sent **TYSON** a text message about the refund check saying, "They need somebody to verify as the person so I want to be Lauren and James."

Also on or about September 15, 2020, **TYSON** sent text messages to **Nnamani** stating "I have a boa check," "1000 don't have pic," and that it was a "company check."

On October 7, 2020, **Nnamani** sent a text message to **TYSON** saying, "Obviously you must be retarted thinking I ran off n the money still there so if u want to walk in or got somebody to walk in n act like them then cool 14k is there. They need somebody to verify as the person So I wanna be Lauren n James cool." This message refers to the aforementioned refund check in the amount of $15,070.28. The original legitimate recipients for the check were Lauren and Justin.

The actual loss due to **TYSON**'s direct participation in the fraudulent scheme was at least $35,038.28. In total, the foreseeable intended loss amount during **TYSON**'s participation in the fraudulent scheme was at least $129,967.22.

12

**JA65**

SO STIPULATED:

G. Michael Morgan, Jr.
Assistant United States Attorney

Alexus Paige Tyson
Defendant

Michael E. Lawlor, Esq.
Counsel for Defendant

13

**JA66**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CASE NO. LKG-22-023** |
| **ALEXUS PAIGE TYSON** | |
| **Defendant.** | |

**SENTENCING MEMORANDUM OF THE UNITED STATES**

The Government offers this memorandum in aid of sentencing Alexus Paige Tyson ("Defendant"), scheduled for May 2, 2024 and respectfully submits that a sentence of twenty-one months' incarceration followed by five years of supervised release is necessary to comply with the objectives of sentencing set forth in 18 U.S.C. § 3553(a).

The Defendant, an employee with the United States Postal Service ("USPS"), was indicted on January 27, 2022, for Conspiracy to Commit Bank and Wire Fraud, 18 U.S.C. § 1349, ECF 1, after an investigation revealed that the Defendant played a key role in a widespread fraud to wrongfully access money orders, personal checks, Government stimulus checks and other mail that unwitting victims placed into the care of the USPS. The Defendant conspired with her partner, Travis Osita Nnamani, to obtain personal information of victims to falsify legitimate checks and other financial instruments sent by the victims. The co-conspirators would then deposit or cash those checks at the victim financial institutions before withdrawing the funds or transferring them to accounts they controlled. The Defendant also served as a key recruiter of other employees at the USPS to expand the scheme and corrupt additional public officials.

1

**JA67**

The Defendant signed a plea agreement dated September 19, 2023, pleading guilty to Count One of the Indictment.  The Government will also file a Motion for Preliminary Order of Forfeiture for the full amount of the victim's losses, as specified in the plea, in the amount of $129,967.22.

## BACKGROUND

The stipulation of facts signed by the Defendant details a scheme the Defendant orchestrated alongside Travis Osita Nnamani ("Nnamani") and other USPS insiders to victimize and steal from individuals, businesses and financial institutions by illegally accessing victims' mail, then taking personally identifiable information ("PII") from that mail.  The coconspirators then used that information to create fraudulent checks and money orders to steal funds from victims' bank accounts or otherwise intercept funds intended for victims such as Government stimulus checks. The Defendant worked alongside Nnamani, a close associate and romantic partner, to entice numerous USPS employees to provide them either photographs of mail containing PII or physical checks or money orders containing the same, or to sell them physical proprietary and serialized "arrow keys" that USPS mail carriers carry to allow them to open blue mail-collection boxes.  In exchange for promises of money, these USPS employees abused their positions of trust and took advantage of their roles as public servants, particularly Tyson, who spearheaded recruitment efforts of other public servants.

## GUIDELINES

**I. Offense Level**

**A. Total Offense Level**

The Defendant signed a plea agreement dated September 19, 2023, pleading guilty to this charge. At the time of signing, the parties did not agree to a specific range within the Advisory Guidelines.

**JA68**

The government calculates the Defendant's final offense level at 14:

- A **base offense level of 7** pursuant to United States Sentencing Guideline ("U.S.S.G.") § 2B1.1(a)(1).

- An **8-level increase** applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(E), because the intended loss was more than $95,000 but not more than $150,000.

- A **2-level increase** applies, pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i), because the offense involved the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification. Specifically, pictures of checks containing personal identifying information were used by the co-defendants to create fraudulent checks in order to steal from victim accounts.

- A **2-level increase** applies, pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of trust. Specifically, the defendant was employed as a carrier at USPS and used this position in a manner that significantly facilitated the scheme.

- A **2-level reduction** applies, pursuant to U.S.S.G. § 3E1.1(a), based on the Defendant's apparent prompt recognition and acceptance of personal responsibility for the Defendant's Criminal Conduct.

- A **1-level reduction** applies, pursuant to U.S.S.G. § 3E1.1(b), based on the Defendant's timely notification of the Defendant's intention to enter a plea of guilty.

- A **2-level reduction**, as the defendant is a Zero-Point Offender. USSG §§ 4C1.1 (a) and (b).

**B. Criminal History Category**

The Government calculates the Defendant's total criminal history score as zero. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of zero establishes a criminal history category of I.

**C. Guidelines Range**

Given the above calculations, the Defendant's guidelines range is 15 months to 21 months.

3

**JA69**

## ARGUMENT

The Defendant played a major and active role in this fraud. She conspired with Nnamani to defraud various commercial bank entities. The two of them accomplished this in part through Tyson's insider access and knowledge of the USPS' operations. This allowed them to recruit many other mail carriers and postal clerks – who were offered a cut of the fraud proceeds to victimize unwitting customers who used and trusted the USPS with documents containing their PII. Searches of the defendant's phone showcased the Defendant's ability and willingness to help Nnamani grow the fraud by facilitating communications with their co-conspirators. This fraud was limited only by the number of public servants that Tyson could convince to join the scheme, and this conduct will have continuing consequences for the USPS and the public because of the Defendant and her co-conspirators' use and abuse of the public's trust in the USPS employees to carry out their fraud.

**II. A Sentence of 21 Months is Sufficient, But No Greater Than Necessary, to Achieve the Goals of Sentencing.**

A sentencing court must follow the three-step process set forth by *Gall v. United States*. *See* 522 U.S. 38 (2007). First, the court must properly determine the Guideline range. *See Id.* at 49 (citing *Rita v. United States*, 551 U.S. 338, 347-48 (2007)). Second, the court must determine whether to apply any of the guidelines' departure policy statements to adjust the Guideline range. See id. at 49-50. Third, the court must consider all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance—a sentence outside the advisory guideline system—is warranted. *See Id.*

The statutory factors for the court's consideration under 18 U.S.C. § 3553(a) include: 1) the nature and circumstances of the offense and history and characteristics of the defendant; 2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law,

**JA70**

provide just punishment, afford deterrence, protect the public and provide the defendant with needed services; and 3) the kinds of sentences available and the need to avoid unwarranted sentencing disparities. "In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4; see also 18 U.S.C. § 3661. "If the district court decides to impose a sentence outside the guidelines range, it must ensure that its justification supports 'the degree of the variance.'" *United States v. Evans*, 526 F.3d 155, 161 (4th Cir.), cert. denied, 555 U.S. 977, 129 S.Ct. 476, 172 L.Ed.2d 341 (2008) (quoting *Gall*, 552 U.S. at 51). The district court is given "some latitude," and "a degree of deference," to tailor a particular sentence to the circumstances. *United States v. Green*, 436 F.3d 449, 456-57 (4th Cir. 2006); *United States v. Moreland*, 437 F.3d 424, 433 (4th Cir. 2006).

### A. Nature and Circumstances of the Offense and History and Characteristics of the Defendant Pursuant to 18 U.S.C. § 3553(a)(1)

#### i.    History and Characteristics of the Defendant

The Defendant has no significant criminal convictions prior to the instant offense.

#### ii.    Nature and Circumstances of the Offense

The nature and circumstances of the offense are serious, with real victims and an impact on the public that will continue beyond any dollar amount stolen by the Defendant and those public servants that she and Nnamani recruited to defraud the public. The Defendant played a major and active role in this fraud, comparable to that of Nnamani. The Defendant conspired with Nnamani to defraud various commercial bank entities – including specifically an instance of cashing a false check from an elderly victim's BOA account whose information was stolen from the mail – and sending Nnamani photographs of personal checks for him to utilize in forging fake ones.

5

**JA71**

Had the Defendant not been caught, she would certainly have continued preying on the public, attempting to expand her and Nnamani's network of corrupt USPS employees, and finding new ways to obtain PII and drain the bank accounts and intercept funds of those who placed trust and confidence in the mail system.

**B. Need to for the Sentence to Accomplish the Purposes Laid Out in 18 U.S.C. § 3553(a)(2)**

This crime had real victims, and the particularly pernicious recruitment of public servants to carry out this crime requires a serious sentence both to reflect the seriousness of the crime and the need to deter these crimes in the future. Any sentence should take into account the integral role that the Defendant played in this scheme and the way she helped recruit and coach her co-conspirators and exploited their positions to defraud victims. Breaches of the public trust—which the Defendant encouraged—have wide-ranging consequences beyond the dollar value stolen, making these types of schemes particularly harmful. The circumstances here cry out for strong deterrence. The indictment and Stipulation of Facts in this case make clear that there were numerous other USPS employees working with the Defendant from inside the USPS. This sort of criminal activity can and should be deterred by real consequences for those caught committing it.

Also important to the protection of the public and rehabilitation of the Defendant is the imposition of a five-year period of supervised release. The Defendant should reenter society with the benefit of court supervision and the threat of enhanced consequences in the case of additional criminal activity to further deter unlawful action.

**i. Need to avoid unwarranted sentencing disparities among defendants who commit similar conduct under 18 U.S.C. § 3553(a)(6)**

The Government argued at the sentencing of the Defendant's co-conspirator, Nnamani, that Nnamani and the Defendant have comparable culpability for this crime—Nnamani serving as the organizer, and the Defendant serving as recruiter and interfacing with the defrauded banks. The

**JA72**

Government recommended—and the Court imposed—a 36-month sentence for Nnamani, below the guidelines range of 45 to 51 months.  The Government recommended a sentence below the guidelines, despite the serious nature of the offense, because Nnamani was charged under 18 U.S.C. § 1028A, which carries a 2-year-mandatory minimum, while the Defendant was not.  This was despite the Defendant playing an equal role in the conspiracy and, in many ways, fueling the conspiracy far beyond what Nnamani himself would have been able to accomplish.

Rather than allow an unfair disparity between similarly situated individuals, the Government chose to recommend a lower sentence for Nnamani in that case than the Government would otherwise recommend.

Now, the Government requests a high-end of guidelines sentence (21 months) for the Defendant primarily because her conduct, independent of considerations under 3553(a)(6), is egregious and warrants such a sentence.  The Government also argues that a lower sentence would create an even greater disparity between similarly situated and similarly culpable co-conspirators.  A 36-month sentence for Nnamani, and a 21-month sentence for the Defendant, is an equitable way to fulfill the purposes of sentencing, particularly 3553(a)(6).

## **CONCLUSION**

The Defendant helped facilitate a serious and egregious scheme that involved the recruitment and corruption of public servants and mass victimization of individuals who placed their trust in the reputation of the USPS.  For the reasons stated, as well as those presented at the sentencing hearing, the Government submits that a sentence of 21 months, with five years of supervised release, is the appropriate resolution to this case.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | |
| | * | **Case No. LKG-22-023** |
| **ALEXUS PAIGE TYSON** | * | |
| | * | |
| **Defendant.** | * | |

## SUPPLEMENT TO THE DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Alexus Paige Tyson, by and through counsel, Michael E. Lawlor, Adam C. Demetriou, and Brennan, McKenna & Lawlor, Chtd., respectfully submits this Supplement to the Defendant's Memorandum in Aid of Sentencing. On April 18, 2024, Ms. Tyson filed her Sentencing Memorandum in this case. (ECF No. 115.) On May 1, 2024, the undersigned counsel received several letters of support from Ms. Tyson's family members and friends. Those letters are attached to this submission as Exhibit A.[1] The undersigned counsel apologize to the Court for the untimeliness of this submission. Ms. Tyson respectfully requests that this Court consider the sentiments of those who know her best in imposing a sentence in this case.

---

[1] The undersigned counsel have redacted from this public filing the mailing addresses, email addresses, and telephone numbers of the individuals who have submitted letters to the Court.

1

**JA74**

Respectfully submitted,

/s/
_____
Michael E. Lawlor
Adam C. Demetriou
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
301.474.0044
mlawlor@verizon.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 2, 2024, a copy of the foregoing was sent

to the United States Attorney's Office for the District of Maryland, via ECF.

/s/
_____
Michael E. Lawlor

2

# Exhibit A



Dear Judge,

We are Sean and Tracy Tyson, we are the parents of Alexus Tyson. We are writing you this letter on the behalf of our daughter Alexus, judge we honestly don't know what Alexus was thinking, but we can tell you she is a good girl and an excellent Mother. She lost her grandmother 12/28/2018 and they was very close, she was right by my Mom until the end, and she had Paige 4/21/2019, and we think she was really going through a lot. Alexus knows right from wrong and we are sure she regrets the poor choice, she made. We have always been there for her, she wasn't raised to cut corners, and I know she tries her best. She is currently working to jobs and doing some training courses for the fire department. Alexus tries her best to provide for Paige as a single Mom, and we see her trying and we think she is doing a great job, Paige is the happiest 5 year old and she loves her Mommy and needs her. Alexus isn't a bad person Judge, we really believe in our heart she was just in a bad place at that time and made the wrong choices.

Sincerely her parents,

Sean and Tracy Tyson.

*Sean Tyson*

**JA77**

Dear Honorable Judge,

I am writing on behalf of my Grand daugter Paige Turner's mom Alexus Tyson.    I welcomed Alexus into my family in 2018.    Alexus is a very intelligent young lady that was involved with my son, Paige's dad.   I immediately developed a relationship with Alexus because she transparent and kind.   We had alot in common especially our love for God, the church and giving back to the community.    Alexus has volunteered at number of Out Reach activities on behalf of Feed My Sheep Ministries. She calls often to see if there is anything that she can do or contribute.

Alexus has made it a point to spend quality time with Paige.    Whenever she is not working or at school she has Paige doing some type of activity thats nurturing and that fosters an environment that Paige always feels valued.    She disciplines Paige with love and positivity.    She, as a single parent has been a role model and an positive example.    She takes Paige to school and goes to work daily.    She values both her Paige's education.    She and pushes Paige to be her best.

Alexus has provided an atmosphere that is conducive to Paige's overall well being.    Paige is well rounded and has good grades. She participates in cheer leading and swimming. Alexus is always present when ever Paige is involved in any activity.

I am asking that you give leniency in Alexus' sentencing today.     Paige really needs her her mom to continue the daily routines in which she has set for her. Alexus is Paige's biggest supporter's and is present in her daily life. Alexus has expressed extreme remorse in making the bad decision that she made to get her into this situation.    People that make bad decisions are not bad people.

  I hope your sentencing reflects your understanding that Alexus Tyson is a good person.

Thanks for your consideration in this matter.

Sincerely,

Simone Richardson

**JA78**

# COURT REFERENCE LETTER

Jamilla Fulton



Date: April 26, 2024

Dear Your Honor,

My name is Jamilla Fulton, and I am proud to offer my recommendation of Alexis Tyson. I have personally known Alexis Tyson for 1 years as an employee.

Alexus Tyson is a great communicator. She is always polite and respectful. She has shown that she is dependable and reliable when asked to perform any task. She has maintained a positive relationship with the students and staff at Kingsman Academy Public Charter School where she is assigned as a dedicated aide. It is with great confidence that I make a recommendation for Alexus Tyson, as someone who possesses the character and judgement for the betterment of our community.

Please do not hesitate to contact me if you should require any further information.

Sincerely,

**Signature** _____

By Jamilla Fulton Date: 04/26/2024

**JA79**

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MARYLAND

3    SOUTHERN DIVISION

4  UNITED STATES OF AMERICA,      ) CRIMINAL
                                  ) NO. LKG-22-023
5          Plaintiff,             )
                                  )
6  v.                             )
                                  )
7  ALEXUS PAIGE TYSON,            )
                                  )
8          Defendant.             )

9          TRANSCRIPT OF SENTENCING PROCEEDINGS
        BEFORE THE HONORABLE LYDIA K. GRIGGSBY
10            UNITED STATES DISTRICT JUDGE
           THURSDAY, MAY 2, 2024; 3:41 P.M.
11               GREENBELT, MARYLAND
   APPEARANCES:
12
   FOR THE PLAINTIFF:
13
           OFFICE OF THE UNITED STATES ATTORNEY
14         BY:  DARREN S. GARDNER, ESQUIRE
           6406 Ivy Lane, Suite 800
15         Greenbelt, Maryland  20770
           (301) 344-4029
16
   FOR THE DEFENDANT:
17
           BRENNAN, McKENNAN & LAWLOR, CHARTERED
18         BY:  MICHAEL E. LAWLOR, ESQUIRE
           BY:  ADAM C. DEMETRIOU, ESQUIRE
19         6305 Ivy Lane, Suite 700
           Greenbelt, Maryland  20770
20         (301) 474-0044

21  Also Present:  Erik Finneyfrock, USPO

22         Renee A. Ewing, RMR, CRR - (301) 344-3227
              Federal Official Court Reporter
23         6500 Cherrywood Lane, Suite 200
               Greenbelt, Maryland  20770
24
       ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***
25

JA80

1      (Call to order of the Court.)

2          THE COURT:  Good afternoon.

3      (Counsel reply, "Good afternoon, Your Honor.")

4          THE COURT:  If everyone could please be seated for

5  just a minute, I will go over the Court's masking policy.  For

6  counsel, for the government, and the defendant -- and for the

7  defendant, if you are fully vaccinated and comfortable doing

8  so, you can feel free to remove your mask during today's

9  sentencing hearing.

10     For others joining us in the courtroom, I will invite you

11 to remain masked for the comfort and safety of all of us.  The

12 Court is fully vaccinated, so I am going to remove my mask,

13 which will make it a little bit easier for you to hear me

14 hopefully.

15     With that, AUSA Gardner, I invite you to please call the

16 case.

17         MR. GARDNER:  Good afternoon.  The government calls

18 United States vs. Alexus Paige Tyson, Criminal No. LKG-22-23.

19     AUSA Darren Gardner on behalf of the United States.  We

20 are here for a sentencing in this case.

21         THE COURT:  Good afternoon, AUSA Gardner.

22     Counsel for the defendant and the defendant.

23         MR. DEMETRIOU:  Good afternoon, Judge Griggsby.  Adam

24 Demetriou and Michael Lawlor here on behalf of Ms. Alexus

25 Tyson, who is present at counsel table.

1          THE COURT:  Thank you.

2       Just as a little background for the case -- oh, I'm

3   sorry.  I meant to introduce our probation officer.  Apologies.

4          U.S. PROBATION OFFICER ERIK FINNEYFROCK:  That's

5   okay, Your Honor.

6          THE COURT:  Good afternoon.

7          U.S. PROBATION OFFICER ERIK FINNEYFROCK:  Good

8   afternoon.  Erik Finneyfrock with the U.S. District Court and

9   Pretrial Services and Probation.

10          THE COURT:  Good afternoon.

11          U.S. PROBATION OFFICER ERIK FINNEYFROCK:  Good

12   afternoon.

13          THE COURT:  Thank you for being here as well.

14   Apologies for that.

15       We are here today in connection with the sentencing in

16   this matter.  On January 4th of this year, the defendant,

17   Ms. Tyson, pled guilty as to Count One of the indictment in

18   this case.  She was charged in that count with conspiracy to

19   commit bank fraud and wire fraud, in violation of Title 18,

20   United States Code, Section 1349.

21       Thereafter, on March 7th of this year, the Court received

22   the presentence investigation report and recommendation for

23   Ms. Tyson.

24       On April 14th, the government filed a sentencing

25   memorandum making recommendations as to sentencing.

4

1    On April 18th, the defendant also filed a sentencing

2 memorandum with their recommendations as to sentencing.

3    And then I believe it was earlier today the Court also

4 received certain submissions from the defense, three character

5 letters associated with sentencing, which the Court is willing

6 to consider in connection with today's sentencing.

7    I have a couple of preliminary questions for counsel, and

8 then I think we can get into the sentencing hearing.  And my

9 first question is for counsel for the government.  As I

10 indicated, the Court did receive the government's sentencing

11 memorandum.

12    Is there any additional evidence or witness testimony the

13 government wishes to present today?

14         MR. GARDNER:  No, Your Honor.

15         THE COURT:  Okay.  Very good.

16    Similarly for defense counsel, again, I have received

17 your sentencing memoranda, as well as the additional character

18 letters submitted on behalf of Ms. Tyson.  They include a

19 letter from her parents, a letter from her daughter's

20 grandmother, Simone Richardson, and a letter from her

21 supervisor, I believe at one of her current places of

22 employment, by Ms. Jamilla Fulton.

23    Is there additional evidence or testimony that the

24 defense wishes to present today?

25         MR. DEMETRIOU:  No additional testimony or evidence,

1  Your Honor.  And we thank the Court very much for considering

2  the letters.

3      THE COURT:  Very good.  Thank you so much.

4      I did indicate that a presentence investigative report

5  was prepared for this case, and the parties, I believe, have

6  reviewed that report.

7      Is there any objection to the report from the United

8  States?

9          MR. GARDNER:  No, Your Honor.

10         THE COURT:  Is there any objection to the report from

11 the defense?

12         MR. DEMETRIOU:  No, Your Honor.

13         THE COURT:  Okay.  And then the Court will adopt that

14 report without any amendment, and I will make reference to

15 certain items in the report throughout our sentencing hearing

16 today.

17     Counsel, it is the practice of this Court at every

18 sentencing hearing to hold a portion of the proceedings under

19 seal, and that is done whether or not the defendant might be a

20 cooperator in the case.  I think this might be a good time to

21 handle that under seal portion of the proceedings today very

22 briefly, and so I am going to ask that anyone who is not

23 affiliated with the case to briefly step out of the courtroom

24 so we can hold a sealed proceeding, and then we will have you

25 back very shortly.  And once our court security officer seals

1  the courtroom, we will proceed under seal.

2       (Whereupon the courtroom was cleared of the public.)

3       (Conference held at sidebar.)

4       (It is the policy of this court that every guilty plea

5  and sentencing include a bench conference concerning whether

6  the defendant is or is not cooperating.)

7       THE COURT:  Is the door secured?  Okay.

8       Counsel, is there anything that we need to address under

9  seal in connection with today's sentencing, AUSA Gardner?

10      MR. GARDNER:  I don't believe so, Your Honor.

11      THE COURT:  Okay.  Anything from the defense?

12      MR. DEMETRIOU:  No, Your Honor.

13      THE COURT:  All right.  Very good.  Then I think we

14 can conclude our sealed proceeding, and we will invite those

15 who wish to join us to come back in, and just give them a

16 moment to rejoin us in the courtroom.

17      (End of sealed discussion.)

18      (Whereupon the courtroom was opened to the public.)

19      THE COURT:  Counsel, I'd like to begin by taking a

20 look at the calculation of the sentencing guideline range in

21 this case as set forth in the presentence investigative report.

22 I am on page 6 if you want to read along with the Court.  I am

23 going to walk through those calculations, and then I will ask

24 whether there are any objections to the calculations from

25 counsel.

1    The base offense level for this matter is 7 under

2  Sections 2X1.1(a) and 2B1.1(a)(1) of the sentencing guidelines.

3    There is an eight-level increase under Section

4  2B1.1(b)(1)(E) of the guidelines because the foreseeable

5  intended loss in this matter resulting from the defendant's

6  participation in the fraud scheme was more than $95,000 but

7  less than $150,000.

8    The offense level is then increased by two under Section

9  2B1.1(b)(11)(C)(i) of the guidelines because the offense

10  involved the unauthorized transfer or use of any means of

11  identification unlawfully to produce or obtain any other means

12  of identification.

13    The offense level is further increased by two under

14  Section 3B1.3 of the guidelines because the defendant abused

15  her position of trust in connection with this offense.

16    That brings us to an adjusted offense level of 19 which

17  you will see towards the top of page 7 of the report.  There

18  are some adjustments to that figure.

19    First, there is a two-level reduction under Section

20  3E1.1(a) of the guidelines, and this is based upon the

21  defendant's apparent prompt recognition and acceptance of

22  responsibility in connection with this offense.

23    The offense level is also subject to an additional

24  one-level decrease under Section 3E1.1(b) of guidelines in

25  recognition of the defendant's timely notification to the

1  government of her intent to plead guilty in this matter.

2       And the offense level is further reduced by two under

3  Section 4C1.1(a) and (b) of the guidelines because the

4  defendant satisfies the criteria for a zero-point offender.

5       That brings us to a total offense level as to Count One

6  of 14 based upon the Court's understanding of the guideline

7  calculation.

8       The presentence report also indicates that Ms. Tyson's

9  criminal history category is Category No. 1.

10      That brings us, with a total offense level of 14 and

11  Category No. 1, the following recommendations:  15 to 21

12  months' incarceration, a supervised release range following

13  incarceration of two to five years, a fine range of $7500 to $1

14  million; of course, the mandatory $100 special assessment.

15      The Court also understands that restitution must be

16  ordered in this case under the guidelines and federal law.  The

17  Court also understands that the total foreseeable loss amount

18  in this case is $129,967.22, and also that the defendant would

19  not be eligible for probation.

20      Are there any objections to the calculations as just

21  described by the Court from the government?

22           MR. GARDNER:  No, Your Honor.

23           THE COURT:  Are there any objections to the

24  calculations just described by the Court from the defendant?

25           MR. DEMETRIOU:  No, Your Honor.

```
 1          THE COURT:  I think we have a starting place in this
 2   case.  The Court will note, based upon my reading of the
 3   relevant presentence memos before the Court, that the
 4   government is recommending a sentence of 21 months'
 5   incarceration and five months [sic] of supervision following
 6   incarceration; is that correct?
 7          MR. GARDNER:  Five years' supervision.
 8          THE COURT:  Five years.  Pardon me.
 9          MR. GARDNER:  Yes, Your Honor.
10          THE COURT:  I misspoke.  Thank you.
11      And the Court also understands that the defense is
12   recommending a sentence of supervised release and no period of
13   incarceration; is that correct?
14          MR. DEMETRIOU:  That's correct, Your Honor.
15          THE COURT:  Do you have a recommendation with regards
16   to the extent of the supervision in terms of amount of years?
17          MR. DEMETRIOU:  Your Honor, we would leave that in
18   the discretion of the Court.  I will address some of that later
19   in my allocution.
20          THE COURT:  Okay.  And, also, you are recommending a
21   period of home detention at the beginning of the supervision?
22          MR. DEMETRIOU:  That is correct, Your Honor.
23          THE COURT:  We will talk in much more detail about
24   that.  I just wanted to get on the record my understanding of
25   where I think the parties are in this case.
```

1      Why don't we get into talking about the parties' views

2  about where the sentence should be imposed based upon the

3  guideline range.  I first just want to check to see whether

4  either side is seeking any departures from the guidelines.

5      Are there any departures being sought by the United

6  States?

7          MR. GARDNER:  No, Your Honor.

8          THE COURT:  Are there any departures being sought by

9  the defense?

10         MR. DEMETRIOU:  No departures, Your Honor.  Just a

11  variance.

12         THE COURT:  I think we can get to the heart of it and

13  talk a little bit about the variance factors and how the

14  parties view those factors in terms of their recommendations.

15      And I am going to invite AUSA Gardner, if you want to be

16  heard first, again, my understanding is you are recommending a

17  21-month period of incarceration followed by five years of

18  supervised release.  I have read your memo, but if you want to

19  address the Court, you are welcome to do so at this time.

20         MR. GARDNER:  Thank you, Your Honor.

21      This is the third sentencing in this case, and I won't go

22  into too much detail because I think the -- the broader scheme

23  is understood and the government's feelings about the

24  egregiousness of the breach of public trust is also understood.

25      But I do want to talk about the defendant's role a bit.

1  She not only played a key role in obtaining the personal

2  identifiable information of victims, which, in itself, is a

3  pretty egregious act, to use the goodwill and the uniform that

4  you wear and, you know, and the public trust and to -- to see

5  your victims every day and take their information knowing they

6  are going to be your next victim, that that, alone, would be a

7  very egregious act.

8       But she also served as a chief recruiter in this case.

9  The -- the codefendant, Travis Nnamani, may have -- may have

10 birthed the idea, but without somebody like the defendant in --

11 in his -- in his corner doing the recruiting, doing a lot of

12 the heavy lifting, bringing him the -- the information of the

13 victims who he could then continue to, you know, wash the

14 checks and -- and cash them, this -- this never gets off the

15 ground.  This whole scheme never gets off the ground.

16      And there is a question about which is more egregious,

17 the person who has the idea or the person who makes it

18 possible?  And that's why, since the beginning, the government

19 has maintained the position that these two, the -- the

20 defendant in this -- in this case and Codefendant Nnamani, have

21 similar culpability.

22          THE COURT:  You say "similar."  Do you say that it's

23 equal, or do you distinguish between the two?

24          MR. GARDNER:  I -- we do distinguish a bit.  There is

25 -- and I will get into that -- get into that somewhat.  I think

1    there is -- there is a difference between the person who -- who

2    sets it in motion and the person who just has -- has the keys

3    and opens the door.  And -- and the -- the actual act of the

4    aggravated identity theft is a prime distinguisher in this --

5    in this case in terms of culpability.  That's why I say

6    "similar."  And it's -- it's only similar not -- not in the

7    sense of the -- the mens rea, the -- the will to commit

8    criminal acts, but the -- the knowledge that the government can

9    -- can demonstrate.

10        And I will get into that, why we think there is some

11   reason for a variance and why we have recommended the different

12   sentences that we have in this case because of those

13   differences and evidentiary issues partially of what we were

14   able to -- to go forward to a -- to a jury.  But, you know, now

15   at the sentencing posture, it may be a little bit different.

16        I will also just quickly stress that, you know, this is

17   not a victimless case.  And I think there is sometimes a

18   tendency to think of white collar cases, especially where, you

19   know, the victims may include banks and soulless, you know, big

20   -- big organizations, the -- the public trust was a victim in

21   this case.  The post office was a victim in this case.  And

22   certain very vulnerable individuals were victims in this case.

23   And I will -- I will get into that if the Court would like.

24        THE COURT:  Well, the victims, would they include the

25   individuals whose checks were essentially washed?

1          MR. GARDNER:  Absolutely, including an elderly victim

2    who was, you know, victimized a dozen times, and including two

3    checks from that particular victim that were cashed by the

4    defendant in this case.

5          THE COURT:  And the cashing of the checks, of course,

6    the checks were intended for some other recipient.  Right?

7          MR. GARDNER:  Of course.

8          THE COURT:  So the bill was not paid or payment was

9    not made, and, in addition, funds were taken from the person's

10   account and used by someone else?

11         MR. GARDNER:  Absolutely, Your Honor.

12      Now, given that sort of broad context for the, you know,

13   the victim's role in this case, I also want to stress, just

14   reading the Statement of Facts that the defendant has agreed

15   to, it's very clear that she and the defendant, Travis Nnamani,

16   were working, you know, hand-in-glove to further this

17   conspiracy.  They -- you know, hundreds of pages of text

18   messages -- and, again, these are only things that we have --

19   we have agreed these are the facts that both sides have come to

20   a meeting of the minds on -- they show a very close

21   relationship between these two.

22      You know, brainstorming how to -- how to find certain

23   victims' information; setting out, you know, troubleshooting

24   how are we going to get this -- this account opened?  How are

25   we going to, you know, get the most out of this account before

1  the bank understands what's happening?  Who is going to cash
2  this check?
3      You know, these two were very close associates, you know,
4  all the way up until they cooperated, to create, basically, a
5  recruiting -- a recruiting bizarre -- I don't know what you
6  call it -- but a dinner where at least seven employees of the
7  U.S. Postal Service were in attendance because of the
8  defendant, but at -- you know, at -- because of a joined and
9  collective plan of both of them that they would expand their
10  operation and they would use those additional public servants
11  to get more checks, buy more checks, bring them to the meeting.
12      I mean, these -- these two were -- were co-leaders of
13  this operation with different roles.  And I just want to make
14  sure that's stressed.
15          THE COURT:  I want to flesh it out a little bit more
16  because, as you mentioned, there are several codefendants in
17  this case.  I believe this is the last defendant to be
18  sentenced, so we have some information about how the sentences
19  have come out to date.
20      I am trying to get a better understanding of the
21  government's views of Ms. Tyson's culpability vis-à-vis
22  Mr. Nnamani.  And I know it's not a fair apples-to-apples
23  comparison, but you have referred to them as co-leaders, talked
24  about Ms. Tyson's role in the conspiracy.
25          Can -- can you give -- can you compare and contrast?  Do

1    you feel them to be equally culpable or one side more than the

2    other?

3            MR. GARDNER:  With the -- so, the Court may recall

4    that Mr. Nnamani was sentenced with -- and -- and convicted of

5    two different counts.  One was the aggravated identity theft

6    and one was the -- the conspiracy.  At that time, the

7    government made a recommendation, which it viewed as a -- a

8    sentence lower than it would have normally recommended because

9    of the 3553(a)(6) factor which says that similarly culpable

10   defendants should be sentenced similarly.

11           And the government was -- was anticipating this

12   proceeding where a defendant, which it viewed as having, you

13   know, a hand-in-glove relationship with the defendant, with the

14   Defendant Nnamani, would be sentenced, but would be sentenced

15   to a much lower guidelines range because of a -- a particular

16   proof of knowledge that -- that the government was able to

17   charge with Defendant Nnamani but not in this case.  And -- and

18   that was simply a matter of the -- the evidence available to

19   the government, that they thought they could go forward with

20   aggravated identity theft in one but not -- not the other.

21           But the overall scheme, in terms of culpability, there --

22   there is a similar culpability, but a knowledge -- a knowledge

23   element that it couldn't prove -- that we didn't feel like we

24   could prove or we were ready to go to a jury with in this case.

25           So we were more lenient, we thought, in the Nnamani

1  sentencing in terms of our recommendation, with the

2  understanding that similarly culpable defendants should be

3  sentenced similarly, and that's why 36 months in this case and

4  21 -- sorry, in that case, and 21 here gets us to a range of --

5  of similarity which -- which encompasses all -- all of the

6  conduct.  And that's -- that's as, frankly, as good as the

7  government is able to -- to get with the guidelines being what

8  they were and it not thinking this was a case that may warrant

9  a variance upward, but it certainly was considered.

10       THE COURT:  Okay.  So, again -- and I am asking this

11  question not specifically as to the rationale for the two

12  sentences right now, but I hear your point.  Just in terms of

13  the conduct that has been charged with regards to all three

14  defendants -- I am particularly focusing on Ms. Tyson -- do you

15  believe -- I appreciate Mr. Nnamani was charged with slightly

16  different counts -- do you believe that Ms. Tyson's conduct in

17  this case is -- is the same level of culpability as Mr. Nnamani

18  or slightly less or slightly more?

19       MR. GARDNER:  Because the government is not able to

20  show knowledge -- with the aggravated identity theft, in

21  particular, that requires knowledge that somebody is a real

22  person when they are victimized.  That was an element that we

23  could definitely show with -- with Defendant Nnamani.  So, in

24  that case, similar, but not equal.

25       I have to say that this is a less culpable instance

1  because we were not able to show that this defendant knew for a

2  certainty that a particular victim was a real person that was

3  being victimized, and that's, again, because of the -- the --

4  the facts as they came out in that case.

5      So, I have to say less, but similar, and that's why the

6  -- the sentences, frankly, are less, but similar, and I think

7  that we came out this way because of that distinction only.

8          THE COURT:  That's very helpful.

9          MR. GARDNER:  I want to quickly go over a couple of

10  points that I noted in the defense's memorandum and the reasons

11  that they believe it's a case that warrants a variance

12  downward; in fact, a very significant variance downward.  One

13  was that the defendant allegedly left the conspiracy before it

14  ended, 18 months before it ended, and I -- I think it's -- it's

15  a bit much for us to -- to say what the exact timeline is.  It

16  says on or about.  We are always sort of vague about these

17  things.  But, basically, that -- that date where the defendant

18  allegedly, you know, left the conspiracy was just the last act

19  of -- of check fraud, so if -- if we are saying the day after

20  the last check was cashed that the government could show, you

21  know, based on a particular search warrant, that was the last

22  date she was part of the conspiracy, then I guess that's a

23  valid point, but I think common sense says that's not how this

24  actually played out.

25          And the case was indicted in January 2022, at which

1  point, you know, the -- the urgent search for more information

2  about whether this was continuing or not sort of -- sort of

3  stopped because the case was indicted and we were proceeding to

4  a later stage of the case.

5       I also -- the lack of criminal history was another big

6  point, and I do take that into account, and it's taken into

7  account by the guidelines.  And since this case was charged,

8  it's been further taken into account by the guidelines with the

9  two-level additional decrease.

10       And I -- I just want to make the point that if -- if --

11  this may apply to all cases, but cases where a defendant has a

12  low guidelines or a -- a -- a minimum criminal history, by

13  themselves, shouldn't justify a variance downward.  And I

14  think, basically, the Sentencing Commission looked at these

15  cases and said, That's happening quite a bit; that, you know,

16  people with minimal criminal history are being sentenced

17  lightly; let's take that into account in the guidelines because

18  that's what, by and large, the -- the Courts are saying to us

19  when they are doing their averages.

20       And if we -- if we again take the -- the Commission's

21  walk back and the two-level grant that they have basically

22  given zero-level defenders, and say, Well, that's the new

23  goalpost, and arguing from that that a zero point -- you know,

24  a -- a defendant who had -- a defendant without a criminal

25  history now again warrants variances, I think we -- we are

1  getting into a -- a spiral where a variance is always going to

2  be warranted no matter how low the guidelines get.

3      I do think these -- this case significantly takes into

4  account the defendant's newness to the criminal justice system,

5  and the government does as well.  There has been, you know,

6  many variances downward just in terms of the guidelines and

7  what they are.

8      I mean, I -- I will just quickly, you know, wrap up.  Our

9  recommendation for this case we do think is in line with

10 previous defendants and in line with their culpability, and the

11 3553(a) factors do warrant a sentence of 21 months in this case

12 and five years of supervised release.

13      THE COURT:  Thank you.  And before you step away,

14 AUSA Gardner, just a question or two.  I want to talk a little

15 bit about the defendant's personal characteristics and how that

16 may -- the Court should weigh that in terms of issues of

17 deterrence, concerns about future criminal conduct, those types

18 of issues.  Those are some of the factors I also consider.

19      The defendant is working, as the Court understands that

20 she has a very strong work history.  Even during the period of

21 time that she's been involved in this investigation and

22 prosecution, she has maintained employment.  The defendant, I

23 believe, had no other criminal record.  You have somewhat

24 spoken to that already.  But she's complied with her

25 supervision in connection with this case.

1    And particularly the issue of her steady employment --

2    there is a restitution issue in this case we are going to talk

3    about -- two questions.  A period of incarceration -- I just

4    want to talk incarceration to not incarceration because the

5    defense is going to argue no time -- what's your view about how

6    deterrence is best addressed by the Court in this case?  Is a

7    period of incarceration important, in the government's view, to

8    addressing concerns about deterrence, both in terms of

9    deterring this defendant from future conduct like this, but

10   also deterring others who might be engaged in conduct like

11   this?

12       And then I guess my second question goes more to the

13   disruption that comes from incarceration, in a case where we do

14   have a defendant who is working and pursuing professional

15   goals, how you view that in terms of serving the overall goals

16   of sentencing?

17           MR. GARDNER:  In this case, deterrence is -- is quite

18   important, and I think particularly with regard to anybody

19   looking at this from -- from an outside perspective or at the

20   beginning stages of -- of, you know, a criminal enterprise,

21   what message does it send to have a defendant like Mr. Nnamani

22   being sentenced to 36 months because he had the idea and asked

23   somebody else to participate with him, versus, you know, a

24   potentially non-incarceration sentence for somebody who made

25   everything else possible through recruiting, through, you know,

1  strategizing, through going to the bank, through doing a lot of

2  the check cashing?

3      What does it say to have one person who, you know, has

4  knowledge of washing checks versus the one providing them?  I

5  -- I don't know what the -- what message that says, but it

6  certainly says that, you know, being -- being on the inside as

7  a public servant is significantly less bad than -- than the one

8  who is -- who is on the outside with the idea.

9      So, I will say, just with regard to deterrence, from the

10  outside, I think people will see this as similar conduct and

11  maybe even more egregious in some cases as a public servant,

12  and then they look at the -- the consequences, and if those

13  things aren't even remotely in line with each other, I think

14  that sends a message, and it's not a good one.

15      With -- with regard to disruption, absolutely we take

16  that -- take that into account in many cases, and in -- in this

17  one as well.  This is -- this is the only defendant in which we

18  are, you know, recommending a -- a high -- high end of the

19  guidelines case because the other two -- and that's only

20  because of the, you know, 3553(a)(6) factor which I have gone

21  over.

22      In the other two cases, that wasn't -- that wasn't a

23  countervailing consideration, and we did take that into

24  account.  Where there is not really egregious conduct, of

25  course, that's always a mitigating factor.  In this case, it's

1  just -- the -- the aggravating factors were just enough to

2  overcome that consideration.  The recruitment, the abuse of

3  trust was -- was particularly egregious in this case, and we

4  are in the position, as the government, of just weighing those

5  things and saying, This conduct was -- was quite bad, and what

6  message does it send?  And, you know, it's one of the factors

7  that we considered.  It just wasn't the countervailing and the

8  primary factor in this case that led to the recommendation.

9          THE COURT:  And, lastly, with regards to the period

10  of supervised release following incarceration, is there a

11  particular rationale to the government's recommendation that

12  the supervision extend for five years?

13          MR. GARDNER:  Only that the codefendant, Travis

14  Nnamani, was also sentenced to a five-year period of

15  incarceration [sic], and it does seem like, especially in

16  somebody who is new to the criminal justice system, that a long

17  period of supervision may -- may be helpful.  And I -- you

18  know, over that long of a period, if there is no issue, I think

19  the -- the burden becomes significantly, you know, lessened.  I

20  think Pretrial, you know, raises -- you know, raises the -- the

21  limit of what's allowable, so it should not be a significant

22  imposition, but mostly for equity, and also because it could be

23  very helpful in this case to have, you know, some guidance

24  going forward.

25          THE COURT:  Okay.  Thank you so much, AUSA Gardner.

1  I have no further questions.

2      I am going to invite counsel for the defendant to join

3  the podium at this time.  And you have heard some of my

4  questions to AUSA Gardner, so feel free if you want to respond

5  to any of that as well.  I am sure I will have some additional

6  questions for you as well.

7          MR. DEMETRIOU:  Sure, Your Honor.  Thank you so much.

8      Your Honor, I first want to recognize Sean and Tracey

9  Tyson who are present in court.  These are Ms. Tyson's parents,

10 and I believe the Court has received a letter from them, but I

11 did want to recognize their presence here in court.

12         THE COURT:  Good afternoon.

13     (Unidentified audience members reply, "Good afternoon.")

14         MR. DEMETRIOU:  Your Honor, as the Court knows, we

15 are here for Ms. Tyson's sentencing.  And -- and it is a very

16 difficult day.  It's a very difficult day for her because the

17 Court is presented with someone who, apart from the time period

18 at issue in this case, has really lived an otherwise good life,

19 and who, for more than three years since this conduct ended,

20 has continued to live a good life, a life that is dedicated to

21 her young daughter who is now five years old, and a life that

22 is dedicated to hard work.  And as the Court mentioned in its

23 earlier remarks, Ms. Tyson has maintained steady employment

24 and, indeed, works multiple jobs.

25         Ultimately, as the Court knows, you know, Congress has

1    directed that the Court impose a sentence that is sufficient,

2    but not greater than necessary, to meet all of the purposes of

3    sentencing, and for the reasons I will set forth, we believe

4    that a sentence of non-incarceration with a term of supervised

5    release and a term -- initial term of supervised release to be

6    served on home detention would meet all of the 3553(a) factors

7    and be an appropriate disposition for Ms. Tyson.

8         Your Honor, I want to start with Ms. Tyson's history and

9    characteristics.  And the Court has already addressed some of

10   those.  I'd first just like to note Ms. Tyson's extremely

11   supportive family.  As I have mentioned, her parents are here.

12   They have supported her throughout all of this.  She and her

13   young daughter, Paige, live with her parents, and they have

14   really been such a great source of support for Ms. Tyson as she

15   has gone through with this first experience in the criminal

16   justice system, and they will continue to support her as she

17   moves forward and as she serves the Court's sentence, whatever

18   sentence the Court may impose.

19        Ms. Tyson is someone who has pursued education.  She's

20   pursued some college.  She has taken courses at Allegheny

21   College and at Montgomery College.  She's also pursued

22   vocational training both in the CDL, commercial driver's

23   license, realm, and also as a beautician.

24        As the Court noted, Ms. Tyson has a long history of work.

25   Obviously, she was working at the post office for a number of

1    years before this case.  She has, of course, as the Court

2    knows, since lost her job, but she's working multiple jobs.

3    She's working at Home Depot.  She is also working as a

4    dedicated aide for students at a charter school, and I believe

5    the Court referenced earlier that it has read and will consider

6    the letter from Ms. Tyson's supervisor that describes her as a

7    very dependable employee and someone who works well with

8    children.

9        As the Court also notes from the presentence report and

10   our sentencing memorandum, Ms. Tyson is a zero-point offender.

11   She comes before the Court with no criminal history, and I

12   think that that's a significant factor here.

13       As we all have, Ms. Tyson has experienced some losses in

14   her life.  There was a loss of a cousin who was murdered when

15   Ms. Tyson was a young person studying in college that did

16   disrupt her college education.

17       In 2018, as the Court may recall from Ms. Tyson -- the

18   letter of Ms. Tyson's parents, Ms. Tyson did lose a grandmother

19   to whom she was extremely close.  Obviously, a few months

20   later, she welcomed her daughter, Paige, into the world, but,

21   of course, Paige never had the chance to meet Ms. Tyson's

22   grandmother.

23       You know, and, of course, in terms of Ms. Tyson's history

24   and characteristics, really what we focused on a lot in our

25   memo and what is at the forefront of Ms. Tyson's life is the

1 fact that she is a single mother of a now five-year-old

2 daughter.  At the time we submitted the memo, Paige was four.

3 She's extremely dedicated to her daughter.  As the letter

4 shows, Ms. Tyson accompanies Paige to her extracurricular

5 activities.  They have gone to pumpkin patch together.  She

6 does cheerleading.  And she's very dedicated to -- to -- to

7 Paige.

8       And I think the Court has also received a letter from

9 Paige's paternal grandmother.  Obviously, it's a very difficult

10 situation, but Paige's father is not able to be a physical

11 presence in her life because he, himself, is involved in the

12 criminal justice system, and I have cited the case number, and

13 his case is currently on appeal.

14       But, you know, Ms. Tyson's history and characteristics,

15 Your Honor, she's a young woman.  She's 27 years old.  She's

16 worked hard.  She's dedicated to her family.  And -- and she is

17 someone who has a lot going for her and she's someone who has

18 demonstrated a sense of resilience, and even in response to

19 this case, this very serious case, she has continued to do the

20 right thing.

21       In terms of the nature of the offense, Your Honor, there

22 is no getting around it, the case is extremely serious.  It

23 represents a breach of the public trust, as Ms. Tyson was an

24 employee of the post office.  It represents a breach of trust

25 to people who -- who, you know, have to have confidence that

1  they can send their mails out to get where they need to go

2  without them being unlawfully intercepted.  So it's very

3  serious, and Ms. Tyson understands the seriousness of the

4  charge.

5          THE COURT:  Do you share AUSA Gardner's view that

6  Ms. Tyson's role in this conspiracy was a significant one and

7  was very close to the role that Mr. Nnamani played?

8          MR. DEMETRIOU:  We vehemently disagree with the

9  government's --

10          THE COURT:  Tell me about that.

11          MR. DEMETRIOU:  Your Honor, in terms of

12  Mr. Nnamani -- and that certainly dovetails into where I was

13  going -- Ms. Tyson was recruited to participate in the scheme

14  by Mr. Nnamani.  The way it worked was that Mr. Nnamani and

15  Ms. Tyson had a mutual friend from their high school years.

16  They ended up happenstance meeting, becoming acquainted again,

17  and then in late July, 2019, a series of text messages began.

18  Mr. Nnamani learned that Ms. Tyson worked for the post office,

19  and soon thereafter, Mr. Nnamani recruited Ms. Tyson into

20  sending him checks.

21      Ms. Tyson's actions were at his direction.  Now, of

22  course, she should have known from the beginning that this was

23  wrong and she should not have participated, but it was

24  Mr. Nnamani who recruited her into that.

25      And to the government's point that Ms. Tyson facilitated

1   conduct in which Mr. Nnamani otherwise could not have engaged,

2   that's belied by the facts of the case.  Ms. Tyson and

3   Ms. Cartledge did not know each other.  And just as Mr. Nnamani

4   recruited Ms. Tyson into the scheme, he recruited Ms. Cartledge

5   into the scheme.

6              THE COURT:  What about the so-called recruitment

7   dinner?

8              MR. DEMETRIOU:  Your Honor, as to the so-called

9   recruitment dinner, in terms of that, I read the government's

10  memo and I looked back a little bit at the discovery.  And so

11  in terms of the recruitment dinner, what we had was a

12  five-second video clip that had been posted by someone on

13  social media, and then there are also messages in the telegram

14  app not with Ms. Tyson, with Mr. Nnamani talking to others

15  about him meeting up with eight postal employees and him

16  getting that PII.  This meeting was really orchestrated at the

17  direction of Mr. Nnamani.

18       Now, of course, Ms. Tyson participated in it and should

19  not have done so, but this was Mr. Nnamani's scheme, it was

20  Mr. Nnamani's idea to expand his -- his -- his scheme, and that

21  is why he wanted to -- to have that meeting.  And I think if

22  the Court looks at the Statement of Facts in support of his

23  plea agreement, the Court will understand why.  I mean, when

24  Mr. Nnamani was stopped by Prince George's County Police,

25  traffic stop September 10th of 2020, the officers found just a

1   trove of the implements of fraud.  There were notebooks that

2   were filled with PII, Social Security Numbers, dates of birth.

3   There were two identifications, Maryland state identifications,

4   found, one with Mr. Nnamani's photograph and an identity theft

5   victim's information; another one that was just clearly not his

6   I.D.  There were thumb drives that had electronically stored

7   information that was PII.

8         And what the Court will also note is that Mr. Nnamani had

9   and rented a storage location, and in the storage location, he

10  -- he had more of the implements of his scheme, including a

11  printer which was the very same model that the post office used

12  to print checks, money orders.  And the way that he got the

13  information about the precise printer to be used in order to

14  avoid detection for his fraud was actually from Ms. Cartledge,

15  who was another person independently recruited into this scheme

16  by Mr. Nnamani.

17        And so, Your Honor, our argument is Ms. Tyson's conduct

18  is serious.  No doubt.  We don't mean to minimize it.  But the

19  government's argument that Ms. Tyson -- I think they put in

20  their sentencing memo, I think this is ECF No. 113 at 7 -- that

21  they had an equal role, that's just not true.  One has admitted

22  -- Mr. Nnamani has admitted to being an organizer, leader, or

23  manager of the criminal activity, and that's not present in

24  Ms. Tyson's case.  One has demonstrably recruited two separate

25  women that we know of to participate in his scheme, and the

1  others have not.

2      And so we do view his conduct as more serious, and

3  certainly what he had when the -- when the -- the authorities

4  -- the state authorities conducted their traffic stop was,

5  indeed, you know, significant, quite serious, and, you know, we

6  don't believe that Ms. Tyson is similarly situated to him.

7      Now, to go further into that argument, Your Honor, the

8  3553(a)(6) factor directs the Court to consider the need to

9  avoid the unwarranted sentencing disparities among

10  similarly-situated defendants who have been convicted of

11  similar conduct.  We have just discussed the conduct aspect

12  there, but in terms of the defendants being similarly situated,

13  that really is not the case, Your Honor.

14      And what I want to note -- and the government sort of

15  made several arguments about its reason for agreeing to a "c"

16  plea for Mr. Nnamani that was ultimately below his guidelines

17  range; some of them seem to be competing with each other -- but

18  what I will note is that Ms. Tyson has responded to this case

19  in the way that the Court would expect, which is working hard,

20  which is dedicating herself to her family, and abiding by the

21  Court 's rules.

22      In terms of Mr. Nnamani, Your Honor, he was detained at

23  CDF pending trial, and that was an order issued by Judge Simms,

24  ECF No. 35, and part of the basis for that order was Judge

25  Simms' finding -- and I am looking at the order -- that he

1    possessed a firearm previously while on electronic monitoring.

2    That's dangerous conduct, and that's something that Judge Simms

3    took into account.

4         But what I also want to note, Your Honor -- and I was

5    doing some research as I was reading the government's

6    memorandum -- Mr. Nnamani, of course, was -- was incarcerated

7    at the Chesapeake Detention Facility.  He pled guilty before

8    the Court on September 13th, 2023.

9         In November of 2023, he was actually charged with assault

10   and a weapons charge while at CDF.  The Maryland Judiciary Case

11   Search public information lists his address as 401 East Madison

12   Street in Baltimore.  It says that he was charged with second

13   degree assault and the possession of a dangerous weapon.  And

14   the complainant is someone who is known to defense attorneys,

15   because we visit the facility, as a correctional officer there.

16        So that's, indeed, serious conduct.  Not a finding of

17   guilt, but certainly something that the Court can consider in

18   determining whether defendants are, indeed, similarly situated

19   when you have someone who is recalcitrant and sliding deeper

20   into criminal activity, and you have another person who, for

21   the 18 months after the end of the conspiracy, engaged in no

22   criminal activity, and for the two years since she has been

23   publicly charged in connection with this case has abided by all

24   of the Court's orders.

25        And, further, in terms of the need to avoid unwarranted

1   sentencing disparities, the Court doesn't only have the

2   information contained in this case with these three defendants,

3   but it also has the JSIN data.  That's the Judiciary Sentencing

4   Information tool.  It's a tool that's created by the Sentencing

5   Commission, and, thus, as the Court knows, contains data from

6   nationwide sentencings.

7        So there are ways to search by the defendant's primary

8   guideline.  You can click on the cell for the relevant criminal

9   history category and the relevant offense level.  And when we

10  do that for Ms. Tyson, what we see is that over the last five

11  fiscal years, 20 percent of those defendants -- and that,

12  again, excludes defendants who have gotten substantial

13  assistance departures -- but 20 percent of those

14  non-cooperating defendants are ultimately not sentenced to

15  terms of incarceration.

16       For those 80 percent who are sentenced to terms of

17  incarceration, it would appear that a variance is -- is quite

18  common because both the mean sentence and the median sentence

19  are around the 10- to 12-month mark, and those are below the

20  advisory guidelines range of 15 to 21 months.

21       And, so, the sentence that the government is advocating

22  is not only out of step in line with the facts of this case,

23  but it's also out of step with sentences that are imposed on a

24  nationwide basis.  And, so, we -- we believe that that sentence

25  would be certainly more than necessary in order to meet the

1  goals of sentencing.

2       Your Honor spoke a little bit in terms of its -- the

3  Court spoke a little bit about its concerns with deterrence

4  and, obviously, the need to promote respect for the law, and

5  that is a prime concern, Your Honor.  What I will note is that

6  for someone in Ms. Tyson's situation, someone who doesn't have

7  a prior criminal history, someone who had what could have been

8  a burgeoning and lucrative career with the Postal Service, the

9  fact that the federal felony conviction is a significant

10 collateral consequence, it obviously will limit Ms. Tyson's

11 employment abilities going forward.

12      Now, of course, she is overcoming that, and, hopefully,

13 she will be in a position where she can really build from the

14 ground up in one place, and, in spite of her conviction here,

15 be able to reach sort of a -- a higher position and a -- and an

16 employment opportunity and be able to provide the best life she

17 can for her family.  But it is a significant consequence, being

18 a convicted federal felon, having lost a job, and living with

19 those going forward, and she knows that it is her fault that

20 she is in that position.  That's why she pled guilty and that's

21 why she knows today that that is where she is.

22      But the requested sentence that we have here, we believe

23 it will promote respect for the law and it will promote the

24 goal for deterrence.  We have cited in our sentencing

25 memorandum just some -- a brief publication from the National

1   Institute of Justice.  That's an arm of the Department of

2   Justice that has really said that increasing the length of

3   sentence, increasing the length of any term of incarceration is

4   not really the -- the most significant deterrent factor; that

5   really the -- the prospect of being caught and knowing that if

6   you engage in this conduct, you will be caught, you will be --

7   you will be punished, that is -- that is a significant

8   deterrent factor.

9        And to the extent anyone is looking at this -- this, you

10  know, case, particularly postal workers or -- or other

11  government employees, they know that it doesn't matter if you

12  stopped this 18 months ago and you have moved on with your life

13  and you think things are going well for you.  The federal

14  government will continue to investigate you, and you will find

15  yourself in front of a United States District Judge and you

16  will have to answer for your conduct.  That is a serious

17  deterrent factor, and I think it's something that, based on the

18  studies that we have cited, goes further towards deterring

19  people who would engage in -- in similar conduct.

20       And, Your Honor, I will -- I will really conclude my --

21  my remarks by noting the -- the letters that we have submitted.

22  And I think those letters speak volumes about who Ms. Tyson is

23  as a person; that she is a valued mother, a valued daughter, a

24  valued community member.

25       Ms. Tyson is someone who has lived a good life, but she's

1   also someone who has made a very poor choice in her past in

2   participating in this conduct, and she knows that this Court's

3   job is to impose the appropriate sentence here.  But for the

4   reasons that we have discussed in the sentencing memorandum and

5   here in front of the Court today, we do believe that the

6   sufficient, but not greater than necessary, sentence is one

7   that does not take Ms. Tyson away from her family, is one that

8   allows her to continue to work in the community, earn money for

9   restitution, make those restitution payments in accordance with

10  the order of the Court, and -- and -- and allow her to

11  reintegrate into society and continue the positive path that

12  she has been on for the last two years.

13       The Court asked at the beginning of the hearing about

14  whether we had any sort of specific recommendation, whether we

15  made a specific request about the term of supervision.  We

16  don't, Your Honor.  But we do obviously acknowledge that, you

17  know, just, again, looking objectively in the three cases, the

18  three defendants here, Ms. Cartledge was ultimately sentenced

19  to a two-year period of supervision; the initial six months

20  were on home detention.  I think it would be appropriate for

21  the Court to impose a longer period of supervision for

22  Ms. Tyson and potentially a longer period or some period of

23  home incarceration at the beginning.  But, obviously, the Court

24  is -- is -- is in a great position to assess what the Court

25  believes is -- is important to meet those 3553(a) factors.

1    And, so, we obviously would certainly trust the Court's

2    discretion on that matter and -- and just ask that the Court

3    impose the requested sentence.

4         THE COURT:  Thank you very much, Counsel.  That's

5    very helpful.  I think I understand the defense's position.  I

6    don't have any questions for you at this time.

7         I do want to give AUSA Gardner a chance, if he wishes to

8    respond to any of the points raised by the defense, to do so if

9    you wish to.

10         MR. GARDNER:  Yes.  Briefly, Your Honor.

11         THE COURT:  Come on up.

12         MR. GARDNER:  Your Honor, with respect to 3553(a)(6)

13   and similarly-situated defendants being treated similarly, I --

14   I think it's worth noting that we should proceed, and I think

15   the Court did proceed based on the stipulation of facts that

16   were signed in both cases and not on, you know, extraneous

17   details that probably the Court didn't know and likely would

18   not have considered proper to consider in Mr. Nnamani's case

19   versus this one.

20         If you look at the Statements of Facts in both cases,

21   which is really what the parties have agreed would -- is the

22   conduct that is being sentenced for, they are remarkably

23   similar.  And the -- they are -- it does seem like there is

24   maybe an attempt to -- to minimize Ms. Tyson's role as a

25   recruiter.

1    And I, just reading from the Statement of Facts, there is

2    a -- page 12 of the -- the plea, it's Ms. Tyson asking

3    Mr. Nnamani, Can you help me make $50,000? and then him

4    responding with instructions about how to make that possible.

5    On the next two paragraphs down, it says, and this is

6    agreed to by all the parties, On or about September 2nd, 2020,

7    Tyson arranged a meeting with Nnamani and seven USPS employees

8    at a restaurant in Greenbelt, Maryland to similarly recruit

9    them to participate in a scheme.  And we -- we signed an

10    agreement saying that was the fact in this case.

11    And if you look at the messages -- I mean, this is all in

12    discovery and its not in front of the Court, I get that -- but

13    there is messages saying who is bringing the checks.  It's like

14    she's got them with her.  You know, it was very clear what was

15    happening at this meeting.

16    So any -- any -- any suggestion that this was not a

17    recruiting meeting made possible by the defendant, that she was

18    not an active recruiter in this case, is just sort of belied by

19    the agreement and -- and by the discovery in this case.

20    There was some mention, and I didn't mention this in mine

21    -- my -- my remarks because Courts sometimes find this helpful

22    and sometimes don't to know the average -- you know, if we take

23    the -- the offense guidelines and say, you know, how many

24    percent of people got this -- this sentence versus this

25    sentence in what court, I have -- I have heard it both ways,

1  but I will also note that, you know, the 10- to 12-month

2  incarceration period, which was the mean and the median in

3  cases with this offense level, who -- who knows if they took

4  into account the role of -- of -- of the person.  Was that

5  person a chief recruiter in this case?  Were they, you know, in

6  a position to -- to expand the conspiracy and the scheme beyond

7  what it would have normally otherwise been able to -- to be?

8  Were they working hand in fist with the -- with the -- the

9  leader of that -- hand-in-glove with the leader of that

10  organization?

11      I will just -- just end with:  The Court asked whether or

12  not the, you know, the government had taken into account the

13  disruption to the defendant, and I -- I will say we absolutely

14  did, and we do in many cases, and there are certainly cases

15  where I recommend, as a, you know, as a representative of the

16  government, below guidelines, sometimes even non-incarceration

17  sentences.  It's -- it's not unusual for the government to do

18  that.

19      In this case, it's -- it's not appropriate because of the

20  egregiousness of the conduct, and to the extent this disrupts

21  the life of the defendant, that is a -- a real burden on

22  society and it's -- it's a shame, but it's -- it's because of

23  the choices the defendant made.  It's not because of anything

24  the government did or did not recommend.

25      We -- we do take that into account, we did, and we came

1  up with the recommendation we did despite it.

2      Thank you.

3      THE COURT:  Thank you very much, AUSA Gardner.

4      I just want to share a few observations, and I am also

5  going to invite our representative from the probation office

6  just to walk through the recommendation in the presentence

7  report.

8      I think, Counsel, in reviewing the memos and the

9  character letters and hearing argument today, there is

10  certainly a number of important mitigating factors in this

11  case.  I think during Ms. Tyson's plea hearing, I also

12  acknowledged the important work that she was doing in terms of

13  trying to maintain employment and move forward professionally

14  and personally.

15      The challenge for the Court is the conduct in this case.

16  And I think the government has made an accurate representation

17  of what the parties have agreed to, and what the evidence

18  before the Court shows was Ms. Tyson's role in this conspiracy,

19  and that makes it very difficult for the Court to accept the

20  notion of no period of incarceration.

21      What that means in terms of where we end up, we will

22  continue to work through that, but I think that's a challenge

23  in the case.  Unfortunately, the facts are the facts -- or, I

24  guess, simply, not unfortunately, the facts are the facts, and

25  that, again, the facts about Ms. Tyson's role in the

1   conspiracy, for all the reasons that I think are outlined in

2   the report and through the arguments today, creates a situation

3   where I don't think no incarceration is an appropriate

4   sentence.

5        I do want to give Probation a chance just to briefly walk

6   through the recommendation in the report, and then the Court

7   has a few additional questions that we need to address I think

8   in the context of the sentencing.

9        Go ahead.

10       U.S. PROBATION OFFICER ERIK FINNEYFROCK:  Yes, Your

11   Honor.

12       Probation in this case is recommending the low -- a

13   sentence in the low end of the guidelines of 15 months with

14   three years of supervised release.  And would you like me to go

15   over the -- the additional conditions of probation?

16       THE COURT:  Let's walk through the special

17   conditions.  I am going to go through them with the defendant,

18   but it would be helpful to hear your views on them.

19       U.S. PROBATION OFFICER ERIK FINNEYFROCK:  Yes.  The

20   additional recommended conditions of supervision that we would

21   be recommending is the defendant provide the probation officer

22   with access to any requested financial information and

23   authorize the release of any financial information, and then

24   pay an outstanding restitution order imposed by the Court.

25       THE COURT:  Thank you.  I am going to review those

1    again later with the defendant.

2         I do have a couple questions about two matters related to

3    sentencing.  And the first one is I am not -- is the government

4    seeking forfeiture in this case in connection with Ms. Tyson?

5              MR. GARDNER:  No, Your Honor.

6              THE COURT:  Okay.  Let's talk about restitution

7    because I know that's something that we are going to need to

8    address in this case both as a matter of law and my

9    understanding.

10        The first understanding is that there is a stipulation as

11   to the amount of the restitution, $129,967.22; is that correct?

12             MR. GARDNER:  That's correct, Your Honor.

13             MR. DEMETRIOU:  That's correct, Your Honor.

14             THE COURT:  All right.  I understand there was some

15   additional information the government was getting together

16   about the victims as it relates to that.

17        What's the status of that, AUSA Gardner?

18             MR. GARDNER:  Your Honor, about an hour before this

19   -- this sentencing began, I got a message from my agent saying

20   he had compiled all of the information.  He's been making many

21   calls to victims to find out if they were reimbursed by the

22   bank and just sort of divvy out everything as -- as it turned

23   out who lost what.  I will be getting that to -- to the Court

24   shortly after this hearing.

25             THE COURT:  And this is the information about the

1   victims as it relates to Ms. Tyson?

2          MR. GARDNER:  I -- I believe this would be joint and

3   several among all the defendants.  I don't know if they have it

4   -- and, in fact, I doubt they have it divvied out to that level

5   of specificity, but in terms of who was a victim of this

6   scheme, that will be provided.

7          THE COURT:  These are the individuals that would be

8   receiving restitution --

9          MR. GARDNER:  Yes, Your Honor.

10         THE COURT: -- in connection with the Court's order?

11      And, again, this restitution amount applies equally to

12  all three defendants in the case?

13         MR. GARDNER:  I believe so, Your Honor, yes.

14         THE COURT:  So my next question -- and I want to make

15  sure defense concurs with the figure.  Do you concur with the

16  figure that I mentioned?

17         MR. DEMETRIOU:  Yes, Your Honor.

18         THE COURT:  And it sounds like you haven't had a

19  chance to review the information AUSA Gardner is mentioning?

20         MR. DEMETRIOU:  That's correct, Your Honor.

21         THE COURT:  Because I am going to need to impose

22  restitution as part of the sentence.  Are we prepared to

23  proceed with sentencing based on where we are with the victim

24  information being outstanding?

25         MR. GARDNER:  The government is, Your Honor.

1          MR. DEMETRIOU:  And we are, too, Your Honor.

2          THE COURT:  All right.  Very good.  I just want to

3    make sure we got that on the record before I go forward.

4          THE DEPUTY CLERK:  Your Honor, for clarification of

5    the record, the document shows Ms. Cartledge not owing any

6    restitution.

7          THE COURT:  That's the third codefendant?

8          THE DEPUTY CLERK:  Correct.

9          THE COURT:  So only Mr. Nnamani?

10          MR. GARDNER:  I will -- I will withdraw my statement.

11    That makes -- that is my memory as well now.

12          THE COURT:  Mr. Nnamani and Ms. Tyson are the two

13    defendants that have restitution orders, or will have

14    restitution orders, and will be jointly and severally liable

15    for the figure we are talking about?

16          MR. GARDNER:  Yes, Your Honor.

17          THE COURT:  Okay.  Is that your understanding as

18    well, Counsel?

19          MR. DEMETRIOU:  That is, Your Honor.

20          THE COURT:  I just want to be clear, since we do have

21    three codefendants, to make sure we are consistent.

22          I think we are at a point now, Counsel, where I would

23    like to talk a little bit about conditions of release after any

24    period of supervision.

25          Ms. Tyson, if the Court sentences you to a period of

1  incarceration, it may also sentence you to a period of

2  supervision once you are released from incarceration, and if I

3  do that, there will be certain conditions that the Court will

4  impose for your period of release.  You may be familiar with

5  that in the context of your pretrial release.  I am going to

6  walk through those conditions with you so you have a chance to

7  confront them.

8      If you want to flip to page 17 of the presentence report,

9  you will see them there.  And I am just going to walk through

10 them, and then I will ask you a few questions to make sure you

11 understand them.  And once we get to the special conditions, I

12 want to have a little time to talk about those as well.

13     There are certain mandatory conditions that I must impose

14 if I impose a period of supervised release as part of your

15 sentence.  They are towards the bottom of page 17, and they are

16 as follows:

17     You must not commit another federal, state, or local

18 crime.

19     You must not unlawfully possess a controlled substance.

20     You must also refrain from any unlawful use of a

21 controlled substance and submit to drug testing as outlined in

22 the conditions.

23     If the Court deems applicable, you must make restitution

24 in accordance with federal law, and that will be applicable in

25 your case.

1      You must also cooperate with the collection of your DNA

2  as directed by your probation officer.

3      If the Court deems applicable, you must comply with the

4  requirements of the Sex Offender Registration and Notification

5  Act.  That is another federal law.

6      If the Court deems applicable, you must also participate

7  in an approved program for domestic violence.

8      Ms. Tyson, do you understand these mandatory conditions

9  of your supervision?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Let's next review the standard conditions

12  of supervision.  You can see them beginning on page 18, and,

13  again, they would also apply to any period of supervised

14  release.

15      First, you must report to your probation officer within

16  72 hours of your release from prison.

17      After you make this initial report, you will also receive

18  instructions about how often you are to report in with your

19  probation officer thereafter, and you must comply with those

20  instructions.

21      You must not knowingly leave the federal judicial

22  district for where you were authorized to reside without first

23  getting the permission of the Court or your probation officer.

24      You must answer truthfully the questions posed to you by

25  your probation officer.

1    You must live at a place approved by your probation

2    officer, and if you plan to change your residence, you must

3    notify your probation officer in advance.

4    You must allow your probation officer to visit you at any

5    time at your home or elsewhere, and allow the probation officer

6    to take any items prohibited by the conditions of your

7    supervision that your probation officer observes in plain view.

8    You must also work full time, which is at least 30 hours

9    per week, unless you have been excused by your probation

10   officer.

11   You must not communicate or interact with someone you

12   know is engaged in criminal activity.

13   If you are arrested or questioned by law enforcement, you

14   must notify your probation officer within 72 hours of your

15   questioning or arrest.

16   If you must -- you must not own or possess or have any

17   access to firearm, ammunition, destructive devices, or other

18   dangerous weapons.

19   You must not act or make any agreement with law

20   enforcement to act as a confidential human source or informant

21   without getting the prior permission of your -- of the Court.

22   If your probation officer determines that you pose a risk

23   to another person, you may be required to notify that person

24   about that risk, and you must comply with the instructions to

25   make that notification.

1        And, lastly, you are to follow all the instructions of

2   your probation officer related to the conditions of your

3   supervision.

4        Ms. Tyson, do you understand the standard conditions of

5   your supervised release?

6              THE DEFENDANT:  Yes.

7              THE COURT:  I want to take a moment to talk further

8   about additional conditions of supervision.  These are

9   additional conditions that the Court is considering that are

10  unique to you and your case, and they are being recommended by

11  the probation office.

12       The first recommended special condition is that you must

13  provide the probation office with access to any requested

14  financial information and authorize the release of any

15  financial information.  The probation office may also share

16  that information with the United States Attorney's Office for

17  this district.

18       The second special condition is that you must pay the

19  outstanding monetary restitution order that will be imposed by

20  the Court.  That amount is $129,967.22.  That's at a rate of

21  $300 per month, to commence 30 days after you are released from

22  incarceration, and that is to be paid to the clerk of this

23  court, and that money will be disbursed to the victims of your

24  crime.

25       Ms. Tyson, do you understand the special conditions of

1    your supervision?

2              THE DEFENDANT:  Yes, I do.

3              THE COURT:  Counsel or Ms. Tyson, are there any

4    objections or concerns about the special conditions?

5              MR. DEMETRIOU:  No, Your Honor.

6              THE COURT:  Are there any concerns from the

7    government about the special conditions?

8              MR. GARDNER:  No, Your Honor.

9              THE COURT:  Does Probation have any further comments

10   about your recommendations on the special conditions of

11   supervision?

12             U.S. PROBATION OFFICER ERIK FINNEYFROCK:  No, Your

13   Honor.

14             THE COURT:  Okay.  Then the Court will be prepared to

15   adopt those special conditions as a part of any period of

16   supervision.

17        Counsel, I think I am at the point now where I am ready

18   to rule, but before doing so, I want to make sure that we have

19   heard fully from the parties.

20        Is there anything further the government wishes to

21   present or state for the Court?

22             MR. GARDNER:  No, Your Honor.

23             THE COURT:  Does counsel for the defense wish to

24   address the Court further?

25             MR. LAWLOR:  Your Honor, not counsel, but Ms. Tyson

1  wants to address the Court.

2          THE COURT:  Ms. Tyson, would you wish to address the

3  Court?

4          THE DEFENDANT:  Yes.

5          THE COURT:  You may do so at this time.

6          MR. LAWLOR:  Can we have your indulgence for one

7  moment, Your Honor?

8          THE COURT:  You want to consult with your client?

9          MR. LAWLOR:  Yes, please.

10          THE COURT:  Let's give them the white noise.

11      (Counsel conferring with client.)

12          MR. LAWLOR:  Thank you, Your Honor.

13          THE COURT:  Ms. Tyson, are you ready to address the

14  Court?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Please adjust the microphone so we can

17  hear her.  Whenever you are ready.

18          THE DEFENDANT:  Okay.  I would like to apologize,

19  just give my apologies for my role in the case and taking full

20  responsibility of it, well, of my part, what it -- what it

21  says.

22      I just want to also -- just with my daughter, I am

23  dedicated.  I have been working.  And since I have been off

24  from the post office, I have been following the guidelines and

25  doing what I am supposed to do in the community, and I have

1    obtained a job, a few jobs that I have had since the post
2    office.
3        And I just want to say I'm sorry for what I have done.
4    And I am pretty embarrassed.  That's why I am kind of just -- I
5    am embarrassed about what -- what I am up here for, so I just
6    want to say I'm sorry for -- for being up here.
7                THE COURT:  Thank you very much, Ms. Tyson.  Are you
8    finished with your statement?
9                THE DEFENDANT:  Yes.  I am finished.
10               THE COURT:  Thank you so much for your remarks to the
11   Court.  You may be seated at this time.  The Court appreciates
12   your remarks, and, again, appreciates the presence of your
13   parents here today for sentencing.
14       I guess I will say a few things before I get into my
15   formal ruling.
16       This is a very difficult moment, and it's not a moment
17   the Court likes to see, particularly with someone like
18   Ms. Tyson who has had the benefit of college, had the benefit
19   of a very strong work history, a single mother caring for a
20   young daughter, and doing so very well from all accounts from
21   the Court.
22       This is not a place where you ever want to be; it's not a
23   place that the Court likes to see; and I am taking into great
24   consideration those circumstances as well as a number of the
25   factors that Ms. Tyson's attorney has raised with the Court

1  both here today and in connection with the papers submitted to

2  the Court in advance.

3      The Court's carefully reviewed the presentence report

4  prepared by our probation office, the sentencing memoranda from

5  counsel, the additional submission from the defense that was

6  submitted earlier today, taken a look at the applicable law, as

7  well as the sentencing guidelines as they relate to the law, as

8  well as the factors that I am required to consider in

9  determining the sentence in this case, and based upon all of

10  that information, I believe that the guideline range of 15 to

11  21 months' incarceration is an appropriate range for this case.

12  I have carefully considered departures to that range which do

13  not apply in this case and also the variance factors which do

14  apply in this case to ensure that I impose a sentence that is

15  sufficient, but not greater than necessary, to comply with the

16  purposes of sentencing.

17      I am going to begin with the aggravating factors because

18  that really, I think, requires a period of incarceration in

19  this case.  We have talked about them quite a bit during the

20  course of our discussion today.

21      Ms. Tyson has pled guilty to committing a conspiracy to

22  commit bank fraud and wire fraud, in violation of Title 18,

23  United States Code, Section 1349, and this particular

24  conspiracy involved a significant breach of the public's trust

25  and the breach of the trust of her employer, being that she was

1   a Postal Service worker and had access, of course, to the mails

2   and to the private communications of the public who entrusted

3   that information to the post office and really to her as an

4   employee with the post office.

5        The harm resulting from her conduct was significant, and

6   the victims are multiple.  And as AUSA Gardner mentioned, of

7   course, the Postal Service has been damaged, but also the

8   individuals who had their checks washed, bills that weren't

9   paid, funds that weren't delivered to the intended recipient,

10  and then having those checks used and cashed and providing

11  funds to the coconspirators in this particular case.  That's a

12  very serious offense.  I heard defense counsel acknowledge

13  that.  I think Ms. Tyson has also acknowledged that today

14  before the Court.  There is no dispute about that.  But that is

15  a significant aggravating factor in this case.

16       The Court asked a number of questions about Ms. Tyson's

17  role in the conspiracy, and I appreciate that there was more

18  than one individual involved in this conspiracy and not all

19  individuals had the exact same involvement, but Ms. Tyson's

20  role, based upon the Court's reading of the facts and the

21  evidence, was a significant one.  She, of course, had access to

22  the mails and to the information that was used to carry out the

23  conspiracy.

24       As defense counsel noted, she knew very well Mr. Nnamani,

25  who has been acknowledged as the organizer and leader of the

1   conspiracy.  The facts before the Court also show that

2   Ms. Tyson and Mr. Nnamani were in regular contact in connection

3   with carrying out the conspiracy.

4        There is also the matter of the dinner that we talked

5   about today, and the Court asked questions of defense counsel

6   about that dinner, and the facts before the Court show that it

7   was used to encourage others at the Postal Service to join in

8   the conspiracy, and, again, Ms. Tyson's role in identifying

9   those individuals and encouraging them to be involved was a

10  significant one.

11       And, so, while the Court would not share the view that

12  Ms. Tyson's role was, quote, equal to Mr. Nnamani's, it was a

13  very significant role and a much more significant role than the

14  other codefendant in this case based upon the facts in front of

15  the Court.

16       And, so, given that role, that really starts the Court at

17  a very high point in the guideline range that I think is

18  appropriate.  And it's from that point in which I will talk

19  about some of the important mitigating factors that defense

20  counsel has raised today and which the Court shares are

21  important to consider.

22       Firstly, as noted, Ms. Tyson has no prior criminal

23  history.  She's engaged in no criminal conduct during the

24  course of the prosecution of this matter.  Much of that is

25  taken into account in the guidelines, but I think it's also an

1  important factor and also one of the reasons why the Court is

2  so troubled that we find ourselves here today.

3      Ms. Tyson is a hard worker.  She has a strong work

4  history.  She's a single mother and is working hard to support

5  her daughter.  Those are important factors.  They are important

6  mitigating factors in terms of Ms. Tyson being able to continue

7  to move forward professionally as well as personally.

8      In terms of deterrence, that was another question the

9  Court raised with the parties, I do think in this case a

10 sentence of incarceration is an important deterrent.  I think

11 that's particularly important in the case where there are facts

12 shown that the defendant was engaged in trying to recruit

13 others to engage in this activity.  And so I think that weighs

14 in favor of some period of incarceration here to make sure that

15 not only Ms. Tyson doesn't engage in this conduct, but that

16 others who may see what happened here will think twice before

17 engaging in similar conduct.

18     The amount of loss in this case is also not

19 insignificant.  It's more than $129,000.  We talked a little

20 bit about the victims who have lost funds, and I think their

21 loss is not just limited to the financial amount, again, for

22 individuals whose personal, private communications were

23 intercepted in connection with carrying out this particular

24 fraud scheme.

25     And, so, for all those reasons, again, I will impose a

1  sentence within the guideline range.  I do think it's

2  appropriate to vary down within that range given the mitigating

3  factors in this case, so I will vary down from the

4  recommendation that the government has made in connection with

5  sentencing.

6       I am also going to impose a period of supervision

7  following Ms. Tyson's release from incarceration, and that will

8  include the conditions that the Court has walked through with

9  Ms. Tyson today.

10      At this time, I am prepared to impose sentence.  I am

11 going to ask Ms. Tyson to please stand with her counsel.  Once

12 she does so, I will formally impose sentence in this case.

13      The defendant, Alexus Paige Tyson, is hereby sentenced to

14 a term of 15 months' incarceration.  This will be followed by a

15 term of three years' supervision upon her release from

16 incarceration.  The Court has addressed with Ms. Tyson the

17 conditions of her supervision, which, again, can be found on

18 pages 18 and 19 of the presentence report.

19      I want to review again the special conditions that the

20 Court will also impose, and they are as follows:

21      First, Ms. Tyson, you must provide your probation officer

22 with access to any requested financial information and

23 authorize the release of that information.  The probation

24 office may also share that information with the United States

25 Attorney's Office.

1        Second, Ms. Tyson, you must pay the outstanding monetary

2    restitution that will be imposed by the Court as a part of your

3    sentence.  That amount is $129,967.22, and your payments will

4    be at a rate of $300 per month, and those payments will begin

5    30 days after your release from incarceration and will be paid

6    through the clerk of the court office at this court.

7        Ms. Tyson, you are also not eligible for probation, and

8    so probation will not be a part of your sentence.

9        With that, Ms. Tyson, you may be seated at this time.

10        Ms. Tyson, I also must inform you of your rights to

11    appeal the sentence imposed by this Court, and so I am going to

12    do that at this time.  And I invite you to please listen

13    carefully to your appeal rights.

14        You have the right to appeal your conviction if you

15    believe that your guilty plea was somehow unlawful or

16    involuntary, or if you believe there is some other fundamental

17    defect in the proceedings that was not waived in your guilty

18    plea.

19        Any notice of appeal that you wish to file must be filed

20    within 14 days of the entry of judgment in your case or within

21    14 days of the filing of a notice of appeal by the United

22    States of America.

23        If you request, the clerk of this court will prepare and

24    file your notice of appeal on your behalf.

25        If you cannot afford to pay the costs of your appeal or

1  for an attorney to represent you on appeal, you also have the

2  right to apply to have a waiver of those fees and have the

3  Court appoint counsel for your appeal.

4      Ms. Tyson, do you understand your rights of appeal?

5      THE DEFENDANT:  Yes.

6      THE COURT:  Counsel, I do believe we also need to

7  address the issue of voluntary surrender as it relates to

8  Ms. Tyson; is that correct?

9      MR. GARDNER:  I believe so, Your Honor.

10      THE COURT:  All right.  Are we prepared to do that at

11  this time?

12      MR. DEMETRIOU:  Yes, Your Honor.

13      THE COURT:  Okay.  Is there a recommendation as to

14  voluntary surrender, a request from the defense?  Let's give

15  them a little white noise.

16      (Counsel conferring with client.)

17      MR. DEMETRIOU:  Yes, Your Honor.  We are requesting

18  voluntary surrender.

19      THE COURT:  Okay.  Do you have a recommendation as to

20  when you'd like that to occur?

21      (Counsel conferring with client.)

22      MR. DEMETRIOU:  Thank you, Your Honor.  We would be

23  requesting a period of 60 days for the self-surrender.

24      THE COURT:  So you are talking, roughly, that would

25  be July 2nd, 2024?

1          MR. DEMETRIOU:  Yes, Your Honor.

2          THE COURT:  I am going to try to put some teeth on it

3   so I can get a reaction from the government.

4          MR. DEMETRIOU:  Yes, Your Honor.

5          THE COURT:  I am going to say July 2nd.

6          MR. DEMETRIOU:  Yes, Your Honor.

7          THE COURT:  Let's hear from AUSA Gardner.

8          MR. GARDNER:  That's fine with the government, Your

9   Honor.

10         THE COURT:  Does Probation have any concerns about

11  the date of voluntary surrender?

12         U.S. PROBATION OFFICER ERIK FINNEYFROCK:  No, Your

13  Honor.

14         THE COURT:  All right.  And I just want to check, is

15  July 2nd a weekday?

16         THE DEPUTY CLERK:  July 2nd would be a Tuesday.

17  Self-surrender would be on Monday, which would be the 1st.

18         THE COURT:  So it would have to be that Monday, July

19  1st.

20         MR. DEMETRIOU:  Yes, Your Honor.  Thank you.

21         THE COURT:  So we will have self-surrender, voluntary

22  surrender on July 1, 2024, to the marshals, and there is no

23  objection, again, from the government to that date?

24         MR. GARDNER:  No, Your Honor.

25         THE COURT:  Then we will have that information

1    included as well in terms of when Ms. Tyson will voluntarily

2    surrender to begin her period of incarceration.

3        Are there any other matters that we need to address today

4    from the perspective of the government?

5                MR. GARDNER:  No, Your Honor.

6                THE COURT:  Anything further from the defense?

7                MR. DEMETRIOU:  Your Honor, we were requesting if the

8    Court would be amenable to recommend placement at FPC Alderson?

9    That's a minimum security female facility in West Virginia.

10               THE COURT:  FPC --

11               MR. DEMETRIOU:  -- Alderson, A-L-D-E-R-S-O-N.

12               THE COURT:  Okay.  Does the government have a

13   position or objection to that recommendation?

14               MR. GARDNER:  No position or recommendation.  Thank

15   you.

16               THE COURT:  Then the Court is very happy to make that

17   recommendation.

18               MR. DEMETRIOU:  Thank you, Your Honor.

19               THE COURT:  Thank you so much.

20               THE DEPUTY CLERK:  Your Honor, I believe -- I don't

21   know if it was stated for the record whether a fine was waived

22   or to be imposed?

23               THE COURT:  Thank you.  I believe the fine is not

24   going to be imposed, but is there a position about any fine in

25   this case?

```
 1              MR. GARDNER:  We have no position, Your Honor.  And I
 2    think it's probably appropriate not to impose a fine in this
 3    case for restitution purposes.
 4              THE COURT:  Do you disagree?
 5              MR. DEMETRIOU:  We would concur, Your Honor.
 6              THE COURT:  Then there will be no fine imposed.
 7         Is there anything further from defense counsel or the
 8    government?
 9              MR. GARDNER:  Nothing from the government, Your
10    Honor.
11              MR. DEMETRIOU:  Nothing, Your Honor.
12              THE COURT:  Anything further from Probation?
13              U.S. PROBATION OFFICER ERIK FINNEYFROCK:  No, Your
14    Honor.  Thank you.
15              THE COURT:  From my courtroom deputy?
16              THE DEPUTY CLERK:  No, Your Honor.
17              THE COURT:  Thank you so much, then, Counsel.  I
18    believe we completed our work here today, and we can stand
19    adjourned.  I wish you a good afternoon.
20         (The proceedings were concluded at 5:01 p.m.)
21
22
23
24
25
```

C E R T I F I C A T E

I, Renee A. Ewing, an Official Court Reporter for the United States District Court for the District of Maryland, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings taken on the date and time previously stated in the above matter; that the testimony of witnesses and statements of the parties were correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription to the best of my ability; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.


/s/ Renee A Ewing

Renee A. Ewing, RPR, RMR, CRR
Official Court Reporter
June 4, 2024

Sheet 1 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)        Judgment Page 1 of 6

BEU

# United States District Court
## District of Maryland

'24 MAY 6 AM 8:54

UNITED STATES OF AMERICA

v.

**ALEXUS PAIGE TYSON**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed on or After November 1, 1987)

Case Number: LKG-8-22-CR-00023-002

Defendant's Attorney: Michael Lawlor, Adam Demetriou
Assistant U.S. Attorney: Darren Gardner

**THE DEFENDANT:**

☒ pleaded guilty to count <u>1 of the Indictment</u>
☐ pleaded nolo contendere to count(s) _____, which was accepted by the court.
☐ was found guilty on count(s) _____ after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy To Commit Wire and Bank Fraud | 01/2021 | 1 |

The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through <u>6</u> of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by <u>U.S. v. Booker</u>, 543 U.S. 220 (2005).

☐ The defendant has been found not guilty on count(s) _____
☐ Counts ___ is/are dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

May 2, 2024
Date of Imposition of Judgment

5-3-24

Lydia K. Griggsby        Date
United States District Judge

Name of Court Reporter: Renee Ewing

Sheet 2 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                    Judgment Page 2 of 6

| DEFENDANT: Alexus Paige Tyson | CASE NUMBER: LKG-8-22-CR-00023-002 |

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of **15 months as to Count 1 of the Indictment**.

☒ The court makes the following recommendations to the Bureau of Prisons:
    ☒ That the defendant be designated to the FPC Alderson for service of her sentence.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ a.m./p.m. on _____.
    ☐ as notified by the United States Marshal.

☒ The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal. If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

    ☒ before 2pm on July 1st, 2024.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146. If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147. For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148. Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By:_____
DEPUTY U.S. MARSHAL

**JA142**

Sheet 3 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                                          Judgment Page 3 of 6

**DEFENDANT: Alexus Paige Tyson**                                    CASE NUMBER: LKG-8-22-CR-00023-002

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **3 years as to Count 1 of the Indictment**.

**The defendant shall comply with all of the following conditions:**

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

### A.   MANDATORY CONDITIONS

1)   You must not commit another federal, state or local crime.
2)   You must not unlawfully possess a controlled substance.
3)   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
     ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4)   ☒   You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5)   You must cooperate in the collection of DNA as directed by the probation officer.
6)   ☐   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7)   ☐   You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page

### B.   STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1)   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2)   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3)   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4)   You must answer truthfully the questions asked by your probation officer.
5)   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6)   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7)   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8)   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

## JA143

Sheet 4 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                    Judgment Page 4 of  6

**DEFENDANT: Alexus Paige Tyson**                          CASE NUMBER: LKG-8-22-CR-00023-002

1)  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
2)  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
3)  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
4)  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
5)  You must follow the instructions of the probation officer related to the conditions of supervision.

## C.    SUPERVISED RELEASE
## ADDITIONAL CONDITIONS

☒ **FINANCIAL DISCLOSURE**
You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the U.S. Attorney's Office.

☒ **RESTITUTION – MONEY**
You must pay the outstanding monetary restitution imposed by the court in the amount of $129,967.22 as directed.

**U.S. Probation Office Use Only**

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

**JA144**

Sheet 5, Part A - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                     Judgment Page 5 of 6

**DEFENDANT: Alexus Paige Tyson**                                 CASE NUMBER: LKG-8-22-CR-00023-002

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 5B.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $100.00 | $129,967.22 | Waived | N/A | N/A |

☐  CVB Processing Fee $30.00

☐  The determination of restitution is deferred until _____.  An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Clerk, US District Court 6500 Cherrywood Lane Greenbelt, MD 20770 For disbursement to victim(s) | | $129,967.22 | |

**TOTALS**               $ _____     $     $129,967.22

☐  Restitution amount ordered pursuant to plea agreement  _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐  the interest requirement is waived for the   ☐   fine   ☐   restitution

   ☐  the interest requirement for the   ☐   fine   ☐   restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Sheet 6 - Judgment in a Criminal Case with Supervised Release (Rev. 12/2019)                                    Judgment Page 6 of 6

**DEFENDANT: Alexus Paige Tyson**                                    CASE NUMBER: LKG-8-22-CR-00023-002

## SCHEDULE OF PAYMENTS

Payment of the total fine and other criminal monetary penalties shall be due as follows:

A ☐   In full immediately; or

B ☒   **$100.00 Special Assessment immediately, balance due (in accordance with C, D, or E); or**

C ☐   Not later than _____; or

D ☐   Installments to commence _____ day(s) after the date of this judgment.

E ☒   **In underlined monthly installments of $300.00 over a period of 3 year(s) to commence when the defendant is placed on supervised release.**

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

Unless the court expressly orders otherwise, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Bureau of Prisons Inmate Financial Responsibility Program, are to be made to the Clerk of the Court.

☐   **NO RESTITUTION OR OTHER FINANCIAL PENALTY SHALL BE COLLECTED THROUGH THE INMATE FINANCIAL RESPONSIBILITY PROGRAM.**

If the entire amount of criminal monetary penalties is not paid prior to the commencement of supervision, the balance shall be paid:

☐   in equal monthly installments during the term of supervision; or

☐   on a nominal payment schedule of $_____ per month during the term of supervision.

The U.S. probation officer may recommend a modification of the payment schedule depending on the defendant's financial circumstances.

Special instructions regarding the payment of criminal monetary penalties:

☒   Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| Travis Osita Nnamani – LKG 22-23-1 | $129,967.22 | Full Amount | |

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

## JA146

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. LKG-22-023** |
| | : | |
| **ALEXUS PAIGE TYSON** | : | |
| | : | |
| **Defendant** | : | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Alexus Paige Tyson, the Defendant in the above captioned case, appeals to the United States Court of Appeals for the Fourth Circuit the judgment and sentence in this case. Ms. Tyson is indigent and respectfully requests that the Fourth Circuit appoint a member of that Court's Criminal Justice Act panel to represent her on appeal.[1]

Respectfully submitted,

s/_____
Michael E. Lawlor
Brennan, McKenna & Lawlor, Chtd.
6305 Ivy Lane
Suite 700
Greenbelt, Maryland  20770
301.474.0044

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 6, 2024, a copy of the foregoing was sent to the United States Attorney's Office for the District of Maryland, via ECF.

s/_____
Michael E. Lawlor

---

[1] The undersigned counsel was appointed to represent Ms. Tyson before the District Court pursuant to the Criminal Justice Act. The undersigned counsel believes it would be appropriate for the Fourth Circuit to appoint new counsel to represent Ms. Tyson on appeal.

1

**JA147**